603 So.2d 206 (1992)
James D. GNAGIE
v.
DEPARTMENT OF HEALTH AND HUMAN RESOURCES, State of Louisiana, et al.
No. 91 CA 0339.
Court of Appeal of Louisiana, First Circuit.
May 22, 1992.
Rehearing Denied August 12, 1992.
*208 A.L. Carbonette, Baton Rouge, for plaintiff-appellant James D. Gnagie.
Thomas Balhoff, Baton Rouge, for DHHR, State of Louisiana.
William Ritzie, Jr., Baton Rouge, for defendant-appellee Cynthia Porche.
Before WATKINS, CARTER and FOIL, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment in wrongful death and survival actions.

BACKGROUND
Plaintiff, James D. Gnagie, and Cathy Griffith Marcus were married on February 5, 1980. Shortly after their marriage, Gnagie was incarcerated at Hunt Correctional Center and was subsequently sent to the Louisiana State Police Barracks as a trustee in August or September, 1980. On January 14, 1982, Joshua Gnagie was born. After his birth, Joshua resided with his mother, who lived with various family members, friends, and male companions. On or about April 20, 1982, James Gnagie and Cathy Griffith were divorced.
On June 29, 1984, the State Central Registry of the Department of Health and Human Resources (DHHR) received a report that Joshua Gnagie had been physically abused. The report was forwarded to the crisis intervention unit, and the case was assigned to Cynthia Porche for investigation. Thereafter, on or about July 10, 1984, a second complaint was received concerning young Joshua. A third and final complaint was filed on or about March 3, 1985, which revealed that three-year-old Joshua Gnagie had died as a result of complications from physical abuse. The child's mother, Cathy Griffith, and her then live-in boyfriend, James "Lucky" Obney, were criminally prosecuted for the child's death.
Shortly thereafter, James Gnagie filed a suit in federal court for damages resulting from the death of Joshua Gnagie, which was subsequently dismissed. On December 23, 1988, Gnagie filed the instant wrongful death and survival actions against DHHR and numerous DHHR officials and employees. After a trial, the jury determined that the following persons were at fault in causing the death of Joshua Gnagie:
(1) DHHR 15%;
(2) [James] Jimmy Gnagie 5%;
(3) James "Lucky" Obney 50%; and
(4) Cathy Griffith Marcus 30%.
With regard to the wrongful death action, the jury refused to award Gnagie damages, and the jury awarded him only $1.00 for the survival action.
From this judgment, Gnagie and DHHR appealed, assigning numerous errors.[1] *209 However, we find it unnecessary to address the errors assigned by the parties because we notice, ex proprio motu, that James Gnagie has no right to bring a survival or wrongful death action for the death of Joshua Gnagie. LSA-C.C.P. art. 927. See Mellon Financial Services Corporation #7 v. Cassreino, 499 So.2d 1160, 1162 (La.App. 5th Cir.1986).

RIGHT OF ACTION
The peremptory exception pleading the objection of no right of action is the procedural device for challenging a plaintiff's interest in judicially enforcing the right asserted. Teachers' Retirement System of Louisiana v. Louisiana State Employees' Retirement System, 456 So.2d 594, 596 (La.1984); Lakeshore Property Owners Association, Inc. v. Delatte, 579 So.2d 1039, 1044 (La.App. 4th Cir.), writ denied, 586 So.2d 560 (La.1991). In instances where certain persons have a remedy for the particular grievance alleged, the peremptory exception pleading the objection of no right of action raises the question of whether the plaintiff belongs to that particular class to which the law grants a remedy. Teachers' Retirement System of Louisiana v. Louisiana State Employees' Retirement System, 456 So.2d at 596-97; Lakeshore Property Owners Association, Inc. v. Delatte, 579 So.2d at 1044; In Re Norton, 471 So.2d 1053, 1055 (La.App. 1st Cir.1985); Gustin v. Shows, 377 So.2d 1325, 1327 (La.App. 1st Cir.1979). Moreover, this objection is designed to terminate a suit brought by one with no legal interest to assert the cause of action. Cortez v. Total Transportation, Inc., 577 So.2d 292, 295 (La.App. 5th Cir.1991); Smith v. Cole, 541 So.2d 307, 311 (La.App. 5th Cir.), affirmed, 553 So.2d 847 (La.1989).
If the plaintiff has a right of action as to any one of the theories or demands for relief set out in his petition, the objection of no right of action should not be maintained. Clement v. McNabb, 580 So.2d 981, 983 (La.App. 1st Cir.1991); Cenac Towing Co. v. Cenac, 413 So.2d 1351, 1352-53 (La.App. 1st Cir.1982). Additionally, in considering an objection of no right of action, evidence is admissible; however, the factual evidence is restricted to whether this particular plaintiff falls within the class having a legal interest to sue upon the cause of action asserted. Lakeshore Property Owners Association, Inc. v. Delatte, 579 So.2d at 1044.
Generally, LSA-C.C. art. 2315 provides (1) for a tort victim's recovery of his damages, (2) if the tort victim dies, for the survival of his right to recover damages in favor of certain benefitted survivors, and (3) if the victim's death is a result of the tort, for a right of action in the survivors to recover their own damages sustained as a result of the victim's wrongful death. Collins v. Becnel, 297 So.2d 506, 508 (La. App. 4th Cir.1974). In the instant case, James Gnagie's petition set forth causes of action for the wrongful death of Joshua Gnagie and for Joshua Gnagie's survival action.
LSA-C.C. art. 2315 also sets forth the persons entitled to bring these actions and provided, at all times pertinent hereto, in part as follows:[2]
*210 The right to recover all other damages caused by an offense or quasi-offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, or either such spouse or such child or children; (2) the surviving father and mother of the deceased, or either of them, if he left no spouse or child surviving; and (3) the surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased.
Therefore, in order to recover for the wrongful death or survival damages of Joshua Gnagie, James Gnagie must establish that he is a member of one of the classes set forth in LSA-C.C. art. 2315.
LSA-C.C. art. 184 establishes a rebuttable presumption that "[t]he husband of the mother is ... the father of all children born or conceived during the marriage." A child's birth or conception during marriage creates a presumption that the husband of the mother is the child's father, unless the husband disavows such paternity within one hundred eighty days after he learns or should have learned of the birth of the child. LSA-C.C. art. 189; Smith v. Jones, 566 So.2d 408, 409 (La.App. 1st Cir.1990). The presumption of article 184 was intended to protect innocent children from the stigma attached to illegitimacy and to prevent case-by-case determinations of paternity. Smith v. Cole, 553 So.2d 847, 854 (La.1989). As a result, the Louisiana Supreme Court has refused to extend the presumption of article 184 beyond its useful sphere. Smith v. Cole, 553 So.2d at 854.
In the instant case, James Gnagie was married to Joshua Gnagie's mother at the time of his conception and birth. James Gnagie did not disavow paternity of Joshua Gnagie. When the presumptive father does not timely disavow paternity, he becomes the "legal" father. Therefore, James Gnagie is the legal father of Joshua Gnagie by virtue of the presumption of LSA-C.C. art. 184.
However, our inquiry does not end here. The jurisprudence clearly establishes that, despite the article 184 presumption, otherwise legitimate children are allowed to establish their filiation to their biological fathers for wrongful death actions and inheritance purposes. Griffin v. Succession of Branch, 479 So.2d 324, 327-29 (La.1985); Smith v. Jones, 566 So.2d at 413. Moreover, biological fathers have been allowed to bring avowal actions despite the presumption of LSA-C.C. art. 184. Smith v. Cole, 553 So.2d at 851.
Under Louisiana law, the presumption that the husband of the mother is the legal father of her children does not preclude the recognition of the actual paternity of the biological father. A filiation action merely establishes the biological fact of paternity and does not bastardize or otherwise affect the legitimate status of the children. Smith v. Cole, 553 So.2d at 855. The result is that the mother and the biological father are required to share the support obligations of the children.
The status of "legal" father does not necessarily confer on that alleged parent *211 all of the rights and obligations of paternity. The Louisiana Supreme Court has declined to hold that the legal father will, in all factual contexts, be made to share the support obligations with the biological father and the mother. Smith v. Cole, 553 So.2d at 855.
In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 2990 77 L.Ed.2d 614 (1983), the United States Supreme Court observed that "[t]he intangible fibers that connect parent and child have infinite variety" and "are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility." The rights of parents have long been recognized as a counterpart of the responsibilities they have assumed. As Justice Stewart noted in his dissenting opinion in Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 1770, 60 L.Ed.2d 297 (1979), "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." Moreover, it is the actual relationship which demonstrates a commitment to the responsibilities of parenthood and has been the focal point in seeking to determine the rights and protection which should be afforded to natural fathers. Smith v. Jones, 566 So.2d at 413.
The issue before this court is whether the legal father of a child is entitled to bring wrongful death and survival actions solely on the basis of the legal fiction of paternity. This issue is res nova in Louisiana. However, we find guidance in the line of cases which have expanded the rights of biological fathers. Those cases consistently hold that it is the actual relationship with the child that is determinative, not the mere biological connection where the biological father has not chosen to timely develop the relationship. Thus, a biological father, who knows or has reason to know of the existence of his biological child and who fails to assert his rights for a significant period of time, cannot later come forward and assert paternity. Smith v. Jones, 566 So.2d at 414. We find that this same principle applicable to those individuals whose only claim to the child is the "legal fiction" of presumed paternity. The purely "legal" father should not be subjected to a more lenient standard than the child's true biological parent.
In the instant case, the evidence presented at trial established that James Gnagie was not Joshua's biological father. Gnagie testified that he and Cathy Griffith were married on February 5, 1980. Shortly after their marriage, James Gnagie was sentenced to imprisonment for the offenses of simple burglary and theft and spent about two months in parish prison in East Baton Rouge. Gnagie then spent approximately three months at Hunt Correctional Center before he was sent to the Louisiana State Police Barracks as a trustee in August or September of 1980. While at the Barracks, Gnagie testified that he received weekend passes once a month beginning at Christmas of 1980. Gnagie testified that he spent more than half of those weekends with Cathy, his brother Joe, and Betty Griffith. Gnagie testified he spent the Easter weekend of 1981 (which was April 18-19) with Cathy at her mother's home. However, Gnagie acknowledged that, on May 27, 1981, he filed suit for divorce from Cathy Griffith on the grounds of adultery and because Cathy was not performing her "wifely duties." Moreover, in his petition, Gnagie alleged that no children had been born of his marriage to Cathy Griffith.[3] Gnagie testified that after his release from prison on October 9, 1981, he continued to *212 sleep with Cathy until December, 1981. However, according to Gnagie's testimony, the divorce, which was granted on April 20, 1982, was predicated on the fact that the parties had lived separate and apart for one year without reconciliation.
Joshua was born approximately nine months after the Easter weekend Gnagie allegedly spent with the child's mother. Gnagie testified that he believed that Joshua was his natural child because Cathy had told him she was pregnant. He acknowledged, however, that Cathy told him on numerous occasions that Joshua was not his child.
Gnagie's father, James R. Gnagie, testified that while his son was in prison he saw Gnagie every weekend and sometimes took Cathy to visit. Gnagie's father testified that, when his son was released for the weekend, he would usually visit with Gnagie and then drop Gnagie off at Cathy's mother's home.
Joshua's mother, Cathy Griffith, testified that although she and Gnagie were married, she did not sleep with Gnagie after he was incarcerated. With regard to the Easter weekend of 1981, Cathy testified she did not reside with her mother at the time, but that she lived with a roommate, Pat Smith. Cathy testified that she spent that weekend with a gentleman by the name of Allen Lemoine. Cathy testified that Gnagie was not Joshua's father and that she never told him that he was Joshua's father.
Cathy's mother, Edna Griffith, testified that in April of 1981 Cathy was living in an apartment with Pat Smith. Edna refuted Gnagie's testimony that he had spent weekends at her home between January and December, 1981.
Patricia Smith testified that she and Cathy lived together in March, 1981 for approximately three to four months. During this time, she and Cathy were inseparable because they did not have a vehicle and shared a ride to work. According to Smith, she and Cathy spent the entire Easter weekend at their apartment with dates. Smith testified that Cathy's date for that weekend was Allen Lemoine. Smith further testified that, during the time she resided with Cathy, Cathy did not spend any time with Gnagie.
Cathy's sister and Gnagie's former common-law wife, Betty Jo Griffith Henderson, testified by deposition. Betty lived with Gnagie for three years. Betty testified that when Gnagie returned from Kentucky, he married her sister, Cathy. Cathy and Gnagie were married only a few weeks when Gnagie went to prison. Betty testified that she knew Allen Lemoine and that he lived with her sister approximately nine months before Joshua was born. According to Betty, after Gnagie went to prison he and Cathy did not spend the night together. Betty also testified that Gnagie had told her and Joe that he knew Joshua was not his natural son. Further, Betty testified that Gnagie never tried to get custody of Joshua.
A thorough review of the record convinces us that the evidence presented sufficiently established that James Gnagie was not Joshua's biological father. At the time of Joshua's conception, James Gnagie was incarcerated. Although he claims to have had sexual relations with Cathy Griffith during the Easter weekend of 1981, the evidence clearly established that she spent that particular weekend with another man. Five weeks after the Easter weekend of 1981, Gnagie filed suit for divorce from Cathy Griffith based on his belief that Cathy was committing adultery. In the divorce petition, Gnagie alleged that Cathy was not performing "wifely duties" and that no children had been born of the marriage. In an effort to refute the testimony that Joshua was not his son, Gnagie testified that he continued to engage in sexual intercourse with Cathy through December of 1981. However, he also testified that, on or about April 20, 1982, he obtained a divorce from Cathy on the grounds that they had lived separate and apart without reconciliation for more than one year.
In addition, we find that the evidence at trial showed that James Gnagie had never acted as a father toward Joshua. Gnagie testified that Cathy never asked him for assistance with Joshua, but that his brother Joe and Betty asked for his financial *213 assistance for the child. Gnagie testified that, when he could, he provided them with money ($20 or $30) for food and clothing for Joshua. Gnagie acknowledged that he did not contribute more than $500.00 in the aggregate for Joshua's support.
Gnagie married Vicky Peyton in April of 1982. Shortly after their marriage, James and Vicky Gnagie lived in Baton Rouge for approximately six months. Gnagie testified that, during the six months he and Vicky lived in Baton Rouge, he saw Joshua at least two to three days a week. In November of 1982, the Gnagies moved to Kentucky where they resided until late March, 1984. During the year and a half that Gnagie lived in Kentucky, he never saw or attempted to see Joshua. Gnagie testified that, after his return to Baton Rouge in 1984, he saw Joshua 75% of the time.
Gnagie testified that after learning of the child's death he called the hospital, but could not get any information. He testified that he attended the funeral for a short period of time, but was not present at the grave site. Gnagie did not pay for any of the funeral expenses. He could not recall the inscription on Joshua's tombstone. Within two months of Joshua's death, Gnagie filed suit in federal court for $6.5 million dollars.
With regard to Gnagie's actions toward Joshua, Betty Griffith testified that between early 1984 and the time of Joshua's death, she baby-sat for Joshua. During the summer of 1984, Betty and Gnagie's brother, Joe, were living in the same apartment complex as Cathy and Lucky Obney. She and Joe cared for Joshua part of the time, and Cathy and Lucky cared for Joshua the other part of the time. Betty testified that during the summer of 1984, Gnagie visited her and Joe once or twice a week. Betty testified that on those occasions Gnagie wanted money to purchase marijuana. Betty denied that Gnagie gave her diapers, food, formula, or any monetary support for Joshua. Betty testified that Gnagie did not come to her home to visit Joshua, but he came only to borrow money for drugs. According to Betty, when Gnagie was in her home, he did not acknowledge Joshua's presence there nor did he have anything to do with Joshua. Betty also testified that Gnagie did not attend Joshua's funeral.
Cathy Griffith testified that Gnagie never provided any support for Joshua. According to Edna Griffith, after Joshua's birth, Cathy and Joshua lived with her or with Lucky Obney. Edna testified that, while Cathy and Joshua resided with her, Gnagie did not see Joshua, did not bring him gifts or money, and did not take him anywhere. Edna attended Joshua' funeral and did not see Gnagie there.
Additionally, the evidence showed that Gnagie did not act as a father toward any of the children he actually recognized as his own. In early 1976, James Gnagie and Cheryl Walls had a son, Robert Merrell Walls. A month later, Gnagie and Cheryl were married. Gnagie could not remember the child's birthday. Gnagie acknowledged that, after about six months of marriage, he and Cheryl separated. Gnagie testified that he never provided any financial support for Robert, wrote the child a letter, or sent the child a birthday or holiday card. Gnagie testified that he failed to provide these things because of an agreement with Cheryl. According to Gnagie, the agreement permitted the man to whom Cheryl is currently married to adopt his son.
Gnagie lived with Betty Griffith for approximately three years ending in 1977. During the time Gnagie and Betty lived together, they had a son, James Denver Henderson.[4] When young Henderson was six months old, Gnagie and Betty ceased living together. Gnagie could not provide any information about this son because Gnagie left Louisiana in 1978 and did not return until 1980. During his absence, Gnagie had no contact with the mother or the child. James Denver spent several years of his life with one of Betty's aunts. Thereafter, he was reared by Betty and Joe Gnagie, Gnagie's brother with whom Betty *214 lived after her relationship with Gnagie ended. Betty Griffith testified that during the time she raised Gnagie's son, James Denver, Gnagie never gave her any money to support the child. Nor did he spend any time with the child. Gnagie testified that he did not help pay for James Denver's special medical care because he was unaware of the child's medical expenses until the bills had already been paid. According to Gnagie, he did not help support James Denver because Betty did not ask. James Denver was subsequently removed from Betty's care by DHHR for neglect, and the child was later adopted. Gnagie did not intervene in the adoption or attempt to care for the child himself.
After carefully reviewing all of the evidence presented, we find that James Gnagie does not have a right to bring an action for the wrongful death of Joshua Gnagie nor is he entitled to assert the child's survival action. Although James Gnagie is Joshua's "legal" father in that he was married to the child's mother at the time of his conception and birth, the evidence clearly established that James Gnagie was not the child's biological parent. Moreover, during the child's lifetime, James Gnagie did not develop a parental relationship with Joshua. In fact, the record established that Gnagie was a virtual stranger to the child. From the time Joshua Gnagie was born, he lived with and was reared by his mother or members of her family. The record shows that James Gnagie did little or nothing to shoulder his responsibilities as a parent.
Clearly, one having no biological relationship and no factual personal relationship whatsoever to the deceased child other than the fictional position of "legal father" should not be permitted to obtain a monetary award because of the child's death.
James Gnagie's only connection to Joshua Gnagie was the legal fiction of paternity created by the presumption of article 184. It is offensive to reason, human dignity, and the memory of this small child that his legal father who so callously ignored him during his life should now reap the benefits of his death. See Cosey v. Allen, 316 So.2d 513, 516 (La.App. 1st Cir.1975).
Therefore, we hold that, with respect to entitlement to bring wrongful death and survival actions under LSA-C.C. art. 2315, the legal fiction of paternity created by virtue of LSA-C.C. arts. 184 and 189 may be refuted or overcome by sufficient evidence that the legal father is not the biological father. Where the evidence is so overwhelming that the legal father is not the actual biological father, as it was in this case, this court will allow the legal fiction to be overcome in the interest of justice. This holding is not intended to apply to fathers who are both the legal and biological fathers of their children.

CONCLUSION
For these reasons, the judgment of the trial court is vacated, and judgment is rendered in favor of defendants and against Gnagie, dismissing his suit with prejudice. James Gnagie is cast with all costs.
JUDGMENT VACATED AND RENDERED.
NOTES
[1] The following specification of errors were assigned by Gnagie:

(1) The trial judge errered (sic) in allowing the defendants a jury trial in this matter based on R.S. 13:5105.
(2) The trial judge erred in allowing the jury to set the amount of the damages based on R.S. 13:5106.
(3) The trial judge erred in dismissing Cynthia Porche from the suit based on immunity granted her under R.S. 14:403.
(4) The trial judge erred in refusing to grant a new trial, or to allow additur or judgment notwithstanding the verdict, and in not increasing the damages (sic) awards to plaintiff in this matter.
(5) The trial judge erred in refusing to allow the admission of the deposition of Joseph Gnagie at the trial.
(6) The trial judge erred in allowing irrelevant and prejudicial evidence that confused and influenced the jury concerning the status of a child of James Gnagie by a previous marriage, and about a child purported to be the child of James Gnagie.
(7) The jury erred in assessing the amount of damages awarded for the pain and suffering of Joshua Gnagie prior to his death at one dollar ($1.00).
(8) The jury erred in assessing the amount of damages awarded James Gnagie for the loss of his son at Zero Dollars (0).
(9) The jury erred in finding James Gnagie 5% negligent in the death of his son.
(10) The jury erred on finding DHHR only 15% negligent in the death of Joshua Gnagie.
The following specifications of error were assigned by DHHR:
(1) The trial court erred in finding that DHHR's alleged negligent conduct was a "legal cause"or proximate causeof Joshua Gnagie's death.
(2) The trial court erred in assigning only five (5%) percent negligence to the conduct of plaintiff James Denver Gnagie; his percentage of negligence should be substantially increased, and in any event, should be greater than any percentage of negligence assigned to DHHR.
[2] Acts 1986, No. 211 amended LSA-C.C. art. 2315 and enacted LSA-C.C. arts. 2315.3 and 2315.4, which were redesignated as LSA-C.C. arts. 2315.1 and 2315.2 respectively. Prior to Act 211, the subject matter of LSA-C.C. arts 2315.1 and 2315.2 was generally covered in LSA-C.C. art. 2315.

LSA-C.C. art. 2315.1 A addresses the survival action and provides as follows:
If a person who has been injured by an offense or quasi-offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi-offense, shall survive for a period of one year from the death of the deceased in favor of:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children;
(2) The surviving father and mother of the deceased, or either of them if he left no spouse or child surviving; and
(3) The surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving.
LSA-C.C. art. 2315.2 A addresses the wrongful death action and provides as follows:
If a person dies due to the fault of another, suit may be brought by the following persons to recover damages which they sustained as a result of the death:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children;
(2) The surviving father and mother of the deceased, or either of them if he left no spouse or child surviving; and
(3) The surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving.
[3] We note that LSA-C.C. art. 1853, which addresses judicial confessions, provides, in pertinent part, as follows:

A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
Admissions in proceedings other than the one currently being adjudicated are considered extrajudicial confessions or admissions. As such, they are evidence, but they do not create conclusive presumptions or operate as an estoppel against the party making them. The only instance where an extrajudicial confession will operate as an estoppel against the party making it is if the party claiming the benefit of the estoppel was deceived by the admission or relied on it to his prejudice. Douglas Oil Tools, Inc. v. Demesnil, 552 So.2d 77, 80 (La.App. 3rd Cir.1989); Financial Corporation v. Estate of Cooley, 447 So.2d 594, 600 (La.App. 3rd Cir. 1984).
[4] At the time of the birth of this child, Betty Griffith was still married to Robert Alton Henderson. As a result, the child was given the surname of his mother's husband.