730 So.2d 873 (1999)
T.D., wife of M.M.M.
v.
M.M.M.
No. 98-C-0167.
Supreme Court of Louisiana.
March 2, 1999.
Rehearing Denied April 1, 1999.
*874 Eric A. Bopp, Arabi, Counsel for Applicant.
Richard A. Tonry, Michael C. Ginart, Jr., Tonry & Ginart, Chalmette, Kim C. Jones, Meraux, Alvin P. Perry, Jr., John V. Robichaux, Jr., Chalmette, Counsel for Respondent.
TRAYLOR, Justice.[*]
This avowal action arose when P.W., the biological father of the minor child, C.M., intervened in the legal parents' custody proceeding to have his parental rights acknowledged. The trial court recognized P.W. as the biological father and ordered that a hearing be conducted to resolve visitation and child support issues in the best interest of the child. On appeal, the court of appeal barred the action under the doctrine of laches, reasoning that P.W.'s delay in filing for more than six years after the birth of the child prejudiced the child. The court of appeal reversed the judgment of the trial court and dismissed the petition in intervention. We granted certiorari to determine whether P.W.'s avowal action is barred under the doctrine of laches.

FACTS AND PROCEDURAL HISTORY
The child's mother, T.D., and legal father, M.M.M., were married in October of 1984. In October of 1985, T.D. met P.W., who was also married at the time. T.D. and P.W. began having adulterous sexual relations in March or April of 1986. The affair spanned a period of approximately seven and one-half years. In March of 1988, T.D. conceived a child, C.M. T.D. informed P.W. that she suspected he was the father because she had not been intimate with her husband at the time of conception. T.D. also informed her husband that he was the father of the child.
T.D. and P.W. discontinued their sexual relations during the pregnancy, but continued *875 with the affair shortly after the child's birth in December of 1988. P.W. testified that he regularly visited the mother and child throughout the affair and always suspected that he was the child's father. In November of 1992, T.D. and M.M.M. separated. At T.D.'s request, P.W. curbed his visits during most of the separation, but resumed them in March of 1993. In April of 1993, the child and P.W. underwent DNA paternity testing. In June of 1993, the DNA test results confirmed to a 99.5% probability that P.W. was the child's biological father. That same month, T.D. and M.M.M. were granted a divorce. In August of 1993, the trial court named T.D. as the domiciliary parent and granted M.M.M. visitation. T.D. ended the affair with P.W. in November 1993 and, thereafter, would not allow P.W. access to the child.
In December 1994, P.W. intervened in the legal parents' domestic proceedings seeking recognition of his biological paternity, joint custody, and visitation. The legal parents objected to this intervention. The court held that P.W.'s suit was not untimely because "his suspicions of parenthood were not confirmed until he received the results of the [DNA test]" and that visitation rights of any parent must be considered in light of the best interests of the child. The court recognized P.W. as the child's biological father, ordered a mental health evaluation of the child to assess possible effects of parentage information and visitation with the biological father, and, finding itself without sufficient evidence to determine the best interest of the child, the court ordered an evidentiary hearing to determine visitation rights and to assess income for potential child support issues.
The legal parents appealed from this ruling, arguing the biological father's action was untimely. The court of appeal found for the legal parents, reversed the trial court, and dismissed P.W. from the proceedings. P.W. sought writs with this court, contending the court of appeal misinterpreted and misapplied the doctrine of laches and, therefore, erred in dismissing his avowal action. P.W. additionally argues the court of appeal erred in failing to defer to the trial court's factual findings. We granted certiorari to determine whether P.W.'s avowal action is barred under the doctrine of laches.

LAW AND DISCUSSION
In order for this court to decide the timeliness of the instant action, we must first set out the jurisprudential background of avowal. Louisiana courts have traditionally recognized a biological father's right to his illegitimate child[1] by means of an avowal action. La. Civ.Code arts. 131, 134, 184; Peyton v. Peyton, 92-107 (La.App. 3 Cir. 2/3/93); 614 So.2d 185; Geen v. Geen, 95-984 (La.App. 3 Cir. 12/27/95); 666 So.2d 1192, 1195, writ den. 96-0201 (La.3/22/96); 669 So.2d 1224; Putnam v. Mayeaux, 93-1251 (La.App. 1 Cir. 11/10/94); 645 So.2d 1223; Chandler v. Grass, 600 So.2d 852 (La.App. 3 Cir.1992). This action is available despite the La. Civ.Code art. 184 presumption that the husband of the mother is the father of all children born or conceived during the marriage.[2]Durr v. Blue, 454 So.2d 315 (La.App. 3 Cir.), writ den., 461 So.2d 304 (La.1984); Smith v. Cole, 553 So.2d 847, 851 (La.1989); Finnerty v. Boyett, 469 So.2d 287, 292 (La. App. 2 Cir.1985); Warren v. Richard, 296 So.2d 813 (La.1974).
*876 In our view, several policy factors favor allowing a biological father to avow his child where such action will result in dual paternity. First, a biological father is susceptible to suit for child support until his child reaches nineteen years of age. La. Civ.Code art. 209. Second, a child who enjoys legitimacy as to his legal father may seek to filiate to his biological father in order to receive wrongful death benefits or inheritance rights. Smith v. Jones, 566 So.2d 408, 412-413 (La.App. 1 Cir.1990); Gnagie v. Department of Health and Human Resources, 603 So.2d 206, 210 (La.App. 1 Cir.); writ den. 608 So.2d 174 (La. 11/13/92). It seems only fair, in light of the obligations to which a biological father is susceptible and the multitude of benefits available to the biological child due to the biological link, that the biological father should be afforded at least an opportunity to prove his worthiness to participate in the child's life. Alternatively, a biological father who cannot meet the best-interest-of-the-child standard retains his obligation of support but cannot claim the privilege of parental rights. Finding that a biological father clearly has the right to avow his illegitimate child under the law of this state, we now turn to the issue of whether P.W. asserted his action in a timely manner.
In order to determine the timeliness of P.W.'s filing, we must address the nature of any time limitations which may apply to avowal actions. Prescription may only be established by legislation. La. Civ.Code art. 3457. There is no prescription statute applicable to a father's action to avow his biological child. Smith v. Dison, 95-0198 (La.App. 4 Cir. 9/28/95); 662 So.2d 90, 94; Putnam v. Mayeaux, 93-1251 (La.App. 1 Cir. 11/10/94); 645 So.2d 1223, 1226-27. Finding no prescription applicable, we now turn to the laches argument championed by the court of appeal.
The legal parents based their appeal on the argument that laches bars a biological father's avowal action where it is not promptly asserted. As a matter of law, the purpose of the doctrine is to prevent an injustice which might result from the enforcement of long neglected rights and to recognize the difficulty of ascertaining the truth as a result of that delay. Barnett v. Develle, 289 So.2d 129 (La.1974). However, this court has clearly established that the common law doctrine of laches does not prevail in Louisiana. Picone v. Lyons, 92-0350 (La.7/1/92); 601 So.2d 1375, reh'g denied 9/3/92. Nevertheless, we have applied the doctrine in rare and extraordinary circumstances. See e.g. State ex rel. Medford v. Whitley, 95-1187 (La.1/26/96), 666 So.2d 652; State ex rel Winn v. State, 95-0898 (La.10/2/96), 685 So.2d 104; State ex rel. Cormier v. State, 95-2208 (La.10/4/96), 680 So.2d 1168 ("laches-like" provisions of La.Code Crim. Proc. art. 930.8(B) authorizes dismissal of any timely-filed inmate's application when the state shows that delay has prejudiced its ability to respond).
We will consider the elements of the doctrine as they apply to the instant case to determine if rare and extraordinary circumstances exist in the instant case which merit application of the doctrine of laches. Regarding the first element of prejudice, we find no proof of prejudice to the child nor to the defendants in intervention, the legal parents. To the contrary, the trial judge expressly limited his ruling to a finding of fact that P.W. is the child's father. The trial court passed on the issue of the best interest of the child because it was without sufficient evidence to make a knowledgeable finding. If evidence of the best interest of the child was lacking, certainly there is insufficient proof institution of this action has caused prejudice to the child. Thus, we find no injustice or prejudice may result from this avowal action. The legal parents failed to prove the first element of laches enunciated in Barnett v. Develle, 289 So.2d 129 (La. 1974).
Regarding the second element of delay, we surmise that the delay in this case is not entirely the fault of the biological father. It is apparent that the actions of the mother have caused much of the delay. See Finnerty v. Boyett, 469 So.2d at 292 (Where the mother of the child effectively causes the delay in the biological father's filing of an avowal action, the delay is not considered unreasonable so as to preclude avowal). P.W. regularly visited his child when he was *877 on good terms with the mother. This appears to be the reason why he did not file suit until after the affair ended and his attempts to visit his child were thwarted. P.W. filed his suit less than one year after it became apparent that he was not free to visit his child, and approximately six years from the child's birth. We find P.W. did not seek enforcement of long neglected rights because his filing was not unreasonable in light of circumstances which impute much of the delay to the mother. Thus, the legal parents failed to prove the second element of laches enunciated in Barnett v. Develle, 289 So.2d 129 (La.1974). Therefore, we find that both requirements precipitating a finding of laches are lacking. Simply put, our jurisprudence provides relief under the doctrine of laches only in rare and extraordinary circumstances. This is not such a case.

CONCLUSION
It is the province of the trial court to determine the nature and extent of a biological father's rights to his illegitimate child. Maxwell v. LeBlanc, 434 So.2d 375 (La.1983). For this reason, we remand this matter to the trial court for such a determination. Assuming arguendo that P.W. can convince the trial court that his involvement in C.M.'s life is in the best interest of C.M., he should not be precluded from participating in the child's life.
We reverse the ruling of the court of appeal which barred P.W.'s avowal action on the basis that his involvement at this stage of his child's life will serve to prejudice the child. We reinstate in full the order of the trial court which recognized P.W. as C.M.'s biological father, ordered the evaluation by a mental health professional, and ordered that an evidentiary hearing be held to determine the best interest of C.M. Accordingly, we remand this matter to the trial court for disposition consistent with the findings herein.

DECREE
REVERSED AND REMANDED.
KNOLL, J., concurs and assigns reasons.
CALOGERO, C.J., dissents and assigns reasons.
KIMBALL, J., dissents and assigns reasons.
KNOLL, J., concurring.
I write separately to concur in the result only. In my view, since Louisiana law (our Civil Code and statutory law) fails to provide for an avowal action for an unwed biological father, the real focus of the majority opinion should be directed toward a consideration of the unwed biological father's constitutional rights, placed in balance with competing interests. Therefore, I disagree with the majority's application of the common law doctrine of laches, which has no statutory or jurisprudential basis in Louisiana.
If an unwed biological father's claim is supported by constitutionally based rights, a procedural bar cannot deny consideration of those claims based on state law or absence thereof, because state law is subordinate to the Constitution according to the supremacy clause. U.S. Const. art. VI, cl. 2; Layne v. City of Mandeville, 93-0046 (La.App. 1 Cir. 12/29/93), 633 So.2d 608, writ denied, 94-0268 (La.3/25/94), 635 So.2d 234. "It is a seminal principle of our law `that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them.' McCulloch v. Maryland, 4 Wheat. 316, 426, 4 L.Ed. 579, 606 (1819)." Hancock v. Train, 426 U.S. 167, 178, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). Therefore, we must not prevent consideration of the ultimate issue on state law grounds. Specifically, the majority should have addressed the unwed biological father's liberty interest in the relationship with his child and whether he may be deprived of his rights without due process of law.
The delicate issue of balancing the rights of the unwed biological father with competing interests is not new to our United States Supreme Court. Parental rights of biological fathers who were not married to the biological mothers were first recognized in Stanley v. Ill., 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The Court noted that "[t]he right to conceive and to raise one's children *878 have been deemed `essential,' `basic civil rights of man.'" Id. at 651, 92 S.Ct. 1208. (Citations omitted.) Therefore, based on a presumption of "unfitness" the State could not deprive the unwed biological father of his children without due process. The unwed father's substantive rights were again recognized in Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). There, the Court concluded that the biological father's "substantive rights were not violated by application of a `best interests of the child' standard." Id. at 254, 98 S.Ct. 549. Based on those two cases, it appears necessary to hold a hearing that explores both the rights of an unwed father and competing interests. In Quilloin, the best interests of the child trumped the biological father's interests. Where a marital unit is intact, the State's interest in preserving the integrity of the marital family may also silence a biological father's competing interests. Id.; Stanley, 405 U.S. at 645, 92 S.Ct. 1208.
The unwed biological father's substantive rights were further defined in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The Court explained that something more than genes was necessary for the biological father to preserve his rights. Lehr focused on the biological father's "grasp[ing the] opportunity and accept[ing] some measure of responsibility for the child's future." Id. at 262, 103 S.Ct. 2985. Only then did the Federal Constitution require a State to provide a forum for the unwed father to voice his opinion as to what was in his natural child's best interest. Id. The Lehr Court was most concerned with whether the State had "adequately protected his opportunity to form such a relationship." Id. at 264, 103 S.Ct. 2985.
In the case sub judice, the biological father did develop a relationship with his natural child, particularly as the natural mother's marriage was drawing to a close. He should not be faulted for not coming forward during the time in which his child's mother was married to another man, because Louisiana's public policy favors protecting the marital unit. Given the presumption of paternity in La.Code Civ.P. art. 184[1] and the strong State interests in preserving the marital family unit that gave rise to the presumption, any efforts made during that marriage would have been properly thwarted.
The fact that a biological father is thwarted from exercising parental rights when the mother is married to another man is not constitutionally offensive, because the balance tips in favor of preserving the marital family over the biological father's individual rights. See Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).[2] However, once the bonds of matrimony are dissolved a vinculo matrimonii, the State's interest in preserving the marital family disappears. This does not ignore the fact that some rights spring from the dissolution of a lawful marriage, but recognizes instead the policy behind the codal provision and the perspective of our times. Today's realities are that illegitimacy and "broken homes" have neither the rarity nor the stigma as in the past. When parenthood can be objectively determined by scientific evidence, and where illegitimacy is no longer stigmatized, presumptions regarding paternity are "out of place." Michael H. v. Gerald D., 491 U.S. 110, 137-147, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (Stevens, J., concurring). I find it significant that the Louisiana legislature, in amending La.Civ.Code art. 184-190 *879 by Act 430 of the 1976 Regular Session, deliberately changed the presumption regarding paternity from conclusive to rebuttable. Smith v. Jones, 566 So.2d 408 (La.App. 1 Cir.), writ denied sub nom. Kemph v. Nolan, 569 So.2d 981 (La.1990). Also significant is Louisiana's recognition of dual paternity. See, e.g., Warren v. Richard, 296 So.2d 813 (La.1974); Smith v. Cole, 553 So.2d 847 (La.1989). In this case, where we have conclusive scientific evidence of true paternity based on DNA testing, it is inappropriate not to address the biological father's substantive rights.
The majority opinion and worthy dissents skirt the constitutional issue and, in effect, "conflate[] the question whether a liberty interest exists with the question what procedures may be used to terminate or curtail it." Michael H. v. Gerald D., 491 U.S. 110, 145, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (Brennan, J., dissenting). In my view, the strong public policies protecting our children are best served not by sweeping the unwed biological father's substantive rights under the procedural rug, but by examining them at a hearing which preserves his due process rights, and balances the biological father's rights against competing interests. Under the Fourteenth Amendment and under La. Const. art. I, § 2, "[n]o person shall be deprived of life, liberty, or property, except by due process of law." La. Const. art. I, § 2. Moreover, balancing tests are traditionally used to resolve problems created by competing rights and interests. Mary Kay Kisthardt, Of Fatherhood, Families and Fantasy: The Legacy of Michael H. v. Gerald D., 65 Tul. L.Rev. 585, 625 (1991). Finally, support for the proposition that an unwed biological father is entitled to a hearing when the mother of his natural child is a single woman, no longer married, may be found in Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).
Hopefully, our Legislature will address this delicate issue which will assist the judiciary in resolving cases of this difficult nature. Indeed, this case poses disturbing issues that are entwined with family matters which are perhaps the most difficult to resolve as they are matters close to the heart. Input from our Legislature would be most helpful and appropriate as this issue is not foreclosed. To demonstrate how difficult this issue is to resolve, I note the prevailing view of the United States Supreme Court in Michael H., which was succinctly summarized by Justice Brennan as an introduction to his dissent:
Five Members of the Court refuse to foreclose `the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth.' Five Justices agree that the flaw inhering in a conclusive presumption that terminates a constitutionally protected interest without any hearing whatsoever is a procedural one. Four Members of the Court agree that [the biological father] has a liberty interest in his relationship with [his natural child], and one assumes ... that he does.
Michael H. at 491 U.S. 135, 109 S.Ct. 2333 (Brennan, J., dissenting) (citations omitted.)
For the reasons above, I respectfully concur in the results.
CALOGERO, C.J., dissenting.
I find it unnecessary to reach the issue of whether an avowal action under these circumstances is barred under the doctrine of laches. Instead, I would hold that this biological father lacks standing to bring an avowal action, as no statutory or codal authority exists granting him standing to rebut the article 184 presumption of paternity. Rather, the Civil Code only permits the child to seek dual paternity. La. Civ. Code art. 209. Moreover, public policy dictates that the relationships among a legal father, child, and his or her mother remain protected, even though the marital relationship has dissolved. Accordingly, I respectfully dissent.
KIMBALL, Justice, dissenting.
I dissent because the majority proceeds to a discussion of laches without first determining both the validity of the avowal action and the categories of persons who are allowed to bring this action, which are issues that this *880 court has never squarely addressed. I consider such a discussion wholly appropriate to the instant case, as there is no codal or statutory authority for the avowal action. Rather, this action is a creation of the lower courts. I also conclude that, even assuming arguendo that such an action exists, a careful examination of the law and the history of the law in this area shows that the intervenor in this suit lacks standing to bring this action.[1]
Although "[t]he husband of the mother is presumed to be the father of all children born or conceived during the marriage," the Code expressly grants standing to rebut this presumption to three parties. La. Civ.Code art. 184. The husband himself has standing to disavow his paternity, but to do so he must put on evidence of facts that show by a preponderance of the evidence that he is not the father. La. Civ.Code art. 187. Absent extraordinary circumstances that prevent him from filing the disavowal, he must bring this action within one hundred and eighty days after he learns or should have learned of the birth. La. Civ.Code art. 189.
The Article 184 presumption is one of the oldest and strongest presumptions found in Louisiana law. See Smith v. Cole, 553 So.2d 847, 850 (La.1989) (noting that the Article 184 presumption is "the strongest known in law"). Its precursor may be found in Article 312 of the Code Napoleon of 1804, which provided that "[a]n infant conceived during marriage claims the husband as his father." As Planiol noted, French law gave standing to dispute the husband's paternity only to the husband himself and his heirs, even though the mother, the child, and other children legitimately born of the marriage may also have an interest in disproving the husband's paternity. 1 Planiol, Traite Elementaire de Droit Civil § 1422 (Louisiana State Law Institute English Translation 1959). Absent a concealed or premature birth or legal separation of the spouses, the French presumption was also very strong. Id. at § 1430, 1439.
The presumption was first manifested in Louisiana law in Article 7 of Chapter II of Title VII of the 1808 Digest of the Civil Law, which read "[t]he law considers the husband of the mother as the father of all children conceived during the marriage." Title VII, Chapter II, art. 7, Civil Laws of the Treaty of Orleans (1808). However, when the presumption was in force, the Digest gave no one, not even the husband himself, standing to rebut this presumption. "The law admits neither the exception of the wife's adultery nor the allegation of the husband's natural or accidental impotency." Id.
The presumption of paternity in the Code of 1825 was no less exacting than that of the Code of 1808. Article 203 of the 1825 Code was a verbatim copy of Article 7 of Chapter II of Title VII of the Digest. The spirit of the second paragraph of former Article 7 of the Digest was seen in Article 204, which provided "[t]he husband cannot by alledging [sic] his natural impotence disown the child, he cannot diswon [sic] it even for cause of adultery, unless its birth has been concealed from him, in which case he will be permitted to prove that he is not its father." Thus, the Digest denied the husband standing to rebut the presumption even if he was impotent or if the child was the result of an adulterous affair.
However, the husband was granted standing in cases where the child's birth had been hidden from him. Article 204 of the 1825 Code provided that "... he cannot diswon [sic] it even in case of adultery, unless its birth has been concealed from him, in which case he will be permitted to prove that he is not its father." As noted by Planiol, the very fact that the birth was hidden attests to the child not being the husband's. 1 Planiol, Traite Elementaire de Droit Civil § 1436 (Louisiana State Law Institute English Translation 1959). Thus, although the husband was granted standing to challenge the presumption of paternity, the standing was limited to the one situation in which it was virtually certain that the child was not his.
In the Code of 1870, the presumption was continued in Article 184, which was a verbatim copy of Article 203 of the 1825 Code. Thus, the husband of the mother was still *881 considered the father of all children conceived during the marriage. La. Civ.Code art. 184 (1870). Further, Article 185 of the 1870 Code still denied the husband standing to disavow the paternity of the child even on account of impotence or adultery, unless the adulterous birth was concealed from him. La. Civ.Code art. 185 (1870).
The presumption and its attendant disavowal provision remained unchanged until 1976. Prior to the revision, disavowal of children was exceedingly rare, and there was a paucity of cases in which a husband successfully disavowed a child.[2]
The 1976 revisions to the Civil Code radically changed both the application of the presumption of paternity and the standing to rebut that presumption. Article 184 now provides that children both born and conceived during the marriage are presumed to be the children of the mother's husband. La. Civ.Code art. 184. Further, the husband of the mother now has standing to rebut the presumption of paternity; this is accomplished simply by "prov[ing] by a preponderance of the evidence, facts which reasonably indicate that he is not the father." La. Civ. Code art. 187. Both the article and the jurisprudence stress that the father must prove facts; a husband who merely alleges that he was not intimate with the mother at the time of conception will not succeed in a disavowal action. See La. Civ.Code art. 187; Mock v. Mock, 411 So.2d 1063 (La.1982) (holding that husband whose only evidence in disavowal action was his own self-serving testimony of lack of sexual relations with mother could not disavow child). Further, absent truly extraordinary circumstances that physically prevent the husband from filing, he has only one hundred and eighty days from the time he learns or should have learned of the birth to bring the disavowal action. La. Civ.Code art. 189. If the husband dies within the one hundred and eighty days, his heirs or legatees have one year from either his death or the birth of the child, whichever is longer, to bring the action. Thus, the husband himself now has standing to rebut the presumption of his paternity in all circumstances in which the child is not his, but, in most cases, he must bring the action within one hundred and eighty days of the child's birth or he is forever barred from doing so.
In another relatively recent innovation, the child also has standing to challenge the presumption of paternity. Article 209 provides in pertinent part that "[a] child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation." This article, which was revised in 1980 and interpreted by this court in 1985, gives a child standing to bring a proceeding to filiate himself to his biological father despite the existence of a presumptive father. Griffin v. Succession of Branch, 479 So.2d 324 (La.1985). However, the Article 209 filiation proceeding does not illegitimate the child. Rather, the child is seen as having both a legal and a biological father and thus enjoys dual paternity. Smith v. Cole, 553 So.2d 847 (La.1989). Finally, La. R.S. 46:236.1(F) gives standing to the Department of Social Services to rebut the presumption of paternity. This statute allows the DSS to prove the biological paternity of a child, including a child that has a presumed father, solely for the purposes of acquiring support for the child. See State Through Department of Health and Human Resources v. Hinton, 515 So.2d 566 (La.App. 1 Cir.1987) *882 (holding that the Department could bring filiation proceedings to establish the true paternity of the child for the purposes of obtaining support); La. Atty. Gen. Op. No. 77-361 (noting that the state may seek a determination of paternity and child support from the biological father of a child who has a presumed father).
Thus, the Article 189 disavowal, the Article 209 filiation, and the La. R.S. 46:236.1 determination of paternity are the only three instances in which standing is given to an individual to challenge the legal relationship between a presumed father and his child. Although the mother may bring a filiation action on behalf of her child, she has no independent standing to challenge the presumption of her husband's paternity. Considering that the La. R.S. 46:236.1 action is available only for the limited purpose of obtaining support for the child and does not give the biological father any parental rights, the father and child themselves are the only ones whom the Code truly allows to challenge the presumed father-child relationship.
In my view, this statutory scheme clearly denies standing to P.W. Given both the long history of protecting both the relationship between the presumed father and the child and the strict guidelines that still control who may challenge the presumption of paternity and when it may be challenged, it is apparent that the Code and its redactors affirmatively chose to deny standing to one in P.W.'s situation.
Moreover, by granting standing only to certain parties and withholding it from others, these codal and statutory laws support several important public policy considerations of the state of Louisiana. First and foremost, these laws protect and strengthen the marital family unit by protecting it from intrusion by biological fathers who have not previously established parental relationships with their children.[3] Second, these laws also protect children by promoting stable family relationships. Finally, these laws protect the substantial and important relationship that develops between a father and child by virtue of the father's care and nurturance of the child, despite the lack of a biological connection.[4]
The evidence in this case illustrates how denying standing to P.W. will uphold these policies. The record shows that C.M. has, as the trial court noted, an especially close and strong bond with M.M.M. Further, although M.M.M. and T.D. were awarded joint custody of C.M., M.M.M. desired and several times moved for sole custody of the child. Tellingly, M.M.M. moved for sole custody of C.M. soon after P.W. filed his avowal action and the results of the DNA test became known, thereby illustrating the strength of the father-son bond between C.M. and M.M.M. In my view, the Code clearly provides, and the legislature intended, that this father-son relationship be allowed to continue without interference from P.W. Accordingly, I respectfully dissent.
NOTES
[*] LEMMON, J., not on panel, recused. See Rule IV, Part 2, § 3.
[1] In this context, we use the term "illegitimate" to connote a child who is not born in the marriage of his biological father to his mother and/or is assumed to be the child of another man. A child who enjoys legitimacy as to his legal father may also be the illegitimate child of his biological parent. Our jurisprudence allowing dual paternity provides that such a child may filiate to his biological father or the biological father may avow the child.
[2] Contrast this to the holding of the U.S. Supreme Court in Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). We find the instant case distinguishable from the former case because, unlike Louisiana law, a California statute specifically prohibits dual paternity and mandates that the husband of the mother of the child born during marriage is conclusively presumed to be the father. Such a finding is not tenable in Louisiana because the law of this State allows recognition of dual paternity and the Article 184 presumption of paternity is rebuttable.
[1] La.Civ.Code art. 184 provides: "The husband of the mother is presumed to be the father of all children born or conceived during the marriage."
[2] The plurality opinion in Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), has been criticized for its apparent use of State's interest as a way of avoiding recognition of the liberty interest that emerged in Stanley, Lehr, and others. Mary Kay Kisthardt, Of Fatherhood, Families and Fantasy: The Legacy of Michael H. v. Gerald D., 65 Tul. L.Rev. 585, 625 (1991). Significantly, and contrary to the facts in the case sub judice, the natural mother in Michael H. did not divorce her husband. Her marriage continued during the time that the biological father sought to preserve his liberty interests. Moreover, unlike Louisiana law, the California presumption was irrebuttable; it was conclusive. Consideration of those significant differences and the illuminating opinions offered in concurrence and dissent suggest that the case sub judice is exactly the type that justifies further regard for the liberty interest involved.
[1] In my opinion, the common law doctrine of laches does not belong in Louisiana's system of civil law. This doctrine has no statutory basis in Louisiana, nor do I believe it should be allowed to creep into this state's jurisprudence.
[2] See Kaufman v. Kaufman, 146 So.2d 199 (La. App.4 Cir.1962) and Singley v. Singley, 140 So.2d 546 (La.App. 1 Cir.1962). Although these cases did allow disavowal, they both involved children born more than three hundred days after a judgment of separation, and Article 187 of the 1870 Code (and Article 206 of the 1825 Code) expressly provided that the presumption did not apply to children born more than three hundred days after a separation. Thus, although Kaufman and Singley were disavowal actions, they did not actually deal with a rebuttal of the presumption of paternity.

See also Feltus v. Bland, 210 So.2d 388 (La. App. 4 Cir.1968). The disavowal in Feltus was allowed under Article 189, which provided that the presumption did not arise when the physical remoteness of the spouses made cohabitation impossible, as the husband was in the Navy and his ship was stationed in the far east (i.e., Pearl Harbor, Subic Bay, Hong Kong, and Yokusaka) at the time of conception. Again, this disavowal involved a situation where the presumption did not arise.
[3] See Griffin v. Succession of Branch, 479 So.2d 324, 328 (La.1985) (noting that "the public policy of this state as embodied in several section[s] of our Civil Code is to protect the family unit and the marital relationship").
[4] As noted by Justice Stewart in his dissent in Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 1770, 60 L.Ed.2d 297 (1979) "[p]arental rights do not spring full-blown from the biological connection between the parent and child. They require relationships more enduring." The relationship between the presumed father and the child in this case is a prime example of a "relationship more enduring" that deserves protection.