806 So.2d 826 (2001)
Cynthia Lee ETCHER and Brad Young, Individually and on Behalf of the Estate of their Minor Daughter Sarah Elizabeth Etcher
v.
Howard J. NEUMANN, M.D., and Louisiana Medical Mutual Insurance Company.
No. 2000 CA 2282.
Court of Appeal of Louisiana, First Circuit.
December 28, 2001.
Rehearing Denied February 21, 2002.
*830 Bobby R. Lormand, Jr., Baton Rouge, LA, Daniel J. McGlynn, Baton Rouge, LA, for plaintiffs/appellees, Cynthia Lee Etcher and Brad Young, individually and on behalf of the estate of their minor daughter, Sarah Elizabeth Etcher.
Janie E. Languirand, Baton Rouge, LA, for defendants/2nd appellants, Howard J. Neumann, M.D. and Louisiana Medical Mutual Insurance Company.
W. Luther Wilson, Baton Rouge, LA, for intervenor/1st appellant, Louisiana Patient's Compensation Fund.
Before CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
CARTER, Chief Judge.
In this medical malpractice action, defendants, Dr. Howard J. Neumann and Louisiana Medical Mutual Insurance Company, and intervenor, Louisiana Patient's Compensation Fund (PCF), appeal a judgment of the district court that was entered in conformity with a jury verdict and awarded damages in connection with Sarah Elizabeth Etcher's death.

FACTS AND PROCEDURAL HISTORY
Plaintiffs Cynthia Lee Etcher and Brad Young, individually and on behalf of the estate of their minor daughter Sarah Elizabeth Etcher, instituted this medical malpractice suit against Dr. Neumann and Louisiana Medical Mutual Insurance Company (collectively, "defendants"). The petition alleges Dr. Neumann breached the standard of care in treating four and one-half month old Sarah in the emergency room on April 21, 1996. The petition further alleges that Dr. Neumann's breach of the standard of care resulted in Sarah's death on April 22, 1996.
Ms. Etcher brought Sarah to the emergency room at Baton Rouge Medical Center at approximately 1:30 p.m. on April 21, 1996. Sarah had awakened that morning with a fever that did not abate with Tylenol. At trial, Ms. Etcher testified she had also noticed a few red spots the size of either flea or mosquito bites on Sarah's torso and arms.
At the emergency room, a triage nurse noted Sarah's temperature to be 103.6 degrees and administered ibuprofen. Dr. Mayeaux, a resident in emergency medicine, then took Sarah's history and performed a physical exam. Dr. Mayeaux noted that Sarah's temperature was 103.6. He did not notice any spots or rash.
*831 Dr. Neumann, an emergency room attending physician next examined Sarah. He too obtained a history and performed a physical exam. Dr. Neumann found Sarah to be smiling, alert and in no acute distress. On Sarah's chart, Dr. Neumann noted there were a few macules on Sarah's chest. Dr. Neumann diagnosed Sarah with "viremia, questionable exanthem." He then discharged Sarah with instructions to Ms. Etcher that she give Sarah Tylenol for fever, bring Sarah to her pediatrician the following day, and return her to the emergency room if her condition worsened.
At approximately 4:45 a.m. the next morning, Ms. Etcher noticed Sarah was restless and discovered Sarah's face, stomach and arms were covered with large purplish-red blotches. Ms. Etcher returned Sarah to the emergency room at Baton Rouge Medical Center where she was examined by Dr. Samuel Reed. Dr. Reed's initial clinical impression was meningococcemia (an overwhelming blood stream infection) with adrenal failure. He began antibiotic therapy. A short time later, Sarah was transported by ambulance to Our Lady of the Lake Regional Medical Center and admitted to their Pediatric Intensive Care Unit. Sarah died at approximately 10:00 a.m. Dr. Bonis at Our Lady of the Lake included on Sarah's chart a final diagnosis of meningococcemia, septic shock and possible meningitis. The chart also notes that Sarah had progressive development of purpura, a discoloration caused by hemorrhage into the tissues, which consumed her whole body. See Dorlands Illustrated Medical Dictionary, 1290 (25th ed. 1974).
Plaintiffs complied with LSA-R.S. 40:1299.41, et seq., and medical review panels were convened to review Sarah's treatment by both Drs. Mayeaux and Neumann. A majority of both panels concluded there was a breach of the standard of care, essentially because a CBC (complete blood count) was not obtained on April 21, 1996.
Thereafter, plaintiffs timely instituted the instant suit. Defendants filed a peremptory exception raising the objection of no right of action with respect to Mr. Young, alleging Ms. Etcher's husband is presumed to be Sarah's father. The trial court overruled the exception, in part relying on a formal acknowledgment by authentic act executed by Mr. Young. The trial court noted that defendants could reassert their exception at trial if Mr. Young failed to establish his biological and parental link to Sarah.
The matter then proceeded to a trial on the merits. The jury determined that Dr. Neumann breached the standard of care in his treatment of Sarah and that Dr. Neumann's breach of the standard of care did cause or contribute to a loss of chance of survival of Sarah. The jury further determined that Sarah lost a chance of survival of 50% or more as a result of Dr. Neumann's breach of the standard of care. The jury awarded Sarah damages in the amount of $50,000.00 for physical and mental pain and suffering. The jury awarded Ms. Etcher damages in the amount of $500,000.00 for past and future mental pain and suffering, past and future loss of love and society, and past and future loss of enjoyment of life. Finally, the jury awarded Mr. Young $50,000.00 for past and future mental pain and suffering, past and future loss of love and society, and past and future loss of enjoyment of life.
Defendants moved the trial court for a judgment notwithstanding the verdict. After a hearing, the trial court granted the motion to the extent that the judgment exceeds the statutory cap applicable to damages in medical malpractice cases under *832 LSA-R.S. 40:1299.42,[2] but denied the motion in all other respects. The PCF subsequently intervened and, with defendants, now appeal.
On appeal, defendants urge the following specifications of error:
1. The trial court erred in failing to provide [defendants'] proposed jury charge number 7; absent this jury charge, any finding by the jury would be manifestly erroneous.
2. The finding by the jury that Dr. Neumann's breach of the standard of care caused Sarah Etcher's death (to lose a chance of survival of 50% or more) was clearly wrong.
3. The trial court erred in overruling [defendants'] objection to examination of Dr. Gary Mall on opinions from the deposition of Dr. Salzman concerning the effect of the administration of antibiotics. This error allowed the introduction of hearsay testimony on a critical issue for determination by the jury in the form of the questions posed by Counsel for [plaintiffs], and could have been the basis of the jury's erroneous finding that Dr. Neumann's breach of the standard of care caused Sarah Etcher's death.
4. The trial court erred in finding that the presumption of paternity provided in Civil Code Article can be rebutted by circumstantial evidence by the biological father three and one-half years after the death of the child for the purpose of establishing a cause of action for wrongful death, when he took no action to acknowledge the child prior to opposing an exception of no right of action.
5. There was no evidence to support the award for damages for pain and suffering to Sarah Etcher.
6. The amount of damages awarded to Cynthia Etcher was excessive.
Additionally, the PCF urges the following specifications of error:
1. The jury erred in concluding that a CBC performed on April 20th [sic] in the emergency room would, more probably than not, have revealed a white blood count of 15,000 and a bacterial infection: hence, the jury erred in finding that the failure to perform the CBC was the cause of the death of Sarah Etcher.
2. The jury erred in concluding that a shot of Rocephin in the emergency room on April 20th [sic] more probably than not would have saved the life of Sarah Etcher: hence, the jury erred in concluding that the failure to give the shot was the [cause of the] death of Sarah Etcher.
3. The jury erred in failing to conclude that this was a "loss of chance" case.
4. The jury awards are clearly excessive.

BREACH OF THE STANDARD OF CARE
On the jury verdict form, the jury responded "YES" to the question "Did Dr. Howard Neumann breach the standard of care in his treatment of Sarah Etcher?" The jury had been instructed that in order to recover, plaintiffs must first prove the degree of care ordinarily practiced by doctors within the defendant's medical specialty and second, that defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
*833 The jury heard the testimony of numerous physicians with regard to the standard of care to which an emergency room physician is held in treating a four and one-half month old child with a fever of 103.6. Defendants argue the testimony at trial established that, in the course of treating Sarah, Dr. Neumann could have chosen a treatment option that did not include the performance of a CBC. However, defendants complain, the jury was precluded from finding that if Dr. Neumann followed that course of treatment that did not require a CBC, then Dr. Neumann was not negligent in his treatment of Sarah. They contend the jury was so precluded by the trial court's failure to include their proposed jury charge number 7 (Charge 7), in its instructions to the jury. Charge 7, as submitted by defendants, states:
In a matter which is largely a judgment decision, if the treating physician follows a course of action sanctioned by authorities as equally qualified as those with opposing views, and his judgment is reasonable and in keeping with accepted standards of care, then the treating physician has been shown to have acted with reasonable care and diligence. A physician faced with several acceptable courses of treatment is not negligent for failing to choose a course of treatment which, at a later time, may be shown to be a wiser course.
Thus, if you find that the defendant exercised reasonable judgment in determining a course of treatment for this patient, consistent with his examinations and the patient's history, then you should render a verdict in favor of the defendant.
Immediately after the jury was instructed on the law and retired to deliberate, the court asked counsel for both parties to state any objections they had to either the jury charges or the verdict form. Plaintiffs made several objections. Defendants then objected to the omission of Charge 7. The record contains the following exchange:
[Defendants' Counsel]: Your honor, I would object to the court's failure to give the defendant's jury charge number seven which states that in a matter which involves judgment, if a physician follows the course of action sanctioned by authorities it's equally qualified as opposing views, et cetera.
The Court: All right. I believe that is included in the general charges plus in the one right before it, number six, which I did give, to which Mr. McGlynn objected thatwhat is included in the charge number seven is included, in other words, in charge number six and charge number thirteen which were included, plus in the general instructions.
Louisiana Code of Civil Procedure article 1793(C) states:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
(Emphasis added.)
The codal provision establishes a mandatory procedural rule for preserving an objection to denial of a requested jury charge for appellate review. The article requires that the litigant object to the refusal to give each special charge and state the grounds for the objection. Petitto v. McMichael, 588 So.2d 1144, 1147 (La.App. 1st Cir.1991), writ denied, 590 So.2d 1201 (La.1992). In this instance, defendants' counsel objected to the trial *834 court's refusal to give Charge 7 and reiterated the charge's contents. However, defendants' counsel did not assign any grounds for the objection. This does not comply with the statute. Petitto, 588 So.2d at 1147.
Courts have held that where the jury instructions or interrogatories contain a "plain and fundamental" error, the contemporaneous objection requirement is relaxed and appellate review is not prohibited. Berg v. Zummo, XXXX-XXXX, p. 13 (La.4/25/01), 786 So.2d 708, 716 n. 5. In the present case, we find the jury was adequately instructed as to the law applicable to the case and that defendants have failed to show a plain and fundamental error requiring the relaxation of the requirements of LSA-C.C.P. art. 1793. Defendants did not properly reserve their right to object to the trial court's ruling regarding Charge 7. Consequently, the objection to the jury instructions was waived. Petitto, 588 So.2d at 1147.
Drs. Thomas Reinecke, Joseph Miceli, Gary Mall and Kelly Michel, all of whom participated in the medical review panels, testified that the standard of care for treating a four and one-half month old child with a fever of 103.6 required that a CBC be obtained. Dr. Reinecke explained to the jury that a CBC allows a physician to look at various components of the blood, particularly the white blood cell count (WBC). Dr. Reinecke explained that the white blood cells are important in fighting infection and tend to either go up or down, above or below the normal range, during a serious infection. Additionally, different types of white blood cells tend to go up or down based on whether the infection might be viral or bacterial.
Dr. Steve Rothrock, who was accepted by the court as an expert in pediatric emergency medicine, disagreed that the standard of care required that Dr. Neumann obtain a CBC. Dr. Rothrock testified that both his own research and the American College of Emergency Physicians (ACEP) clinical policy published in Annals of Emergency Medicine in 1993, indicated the treating physician was required to evaluate the child from head to toe, which evaluation includes obtaining a history and performing a physical exam, then make a clinical decision.
On cross examination, Dr. Rothrock was questioned as to what bearing the presence of the spots or rash on Sarah's body had on the required standard of care. In Sarah's chart, Dr. Neumann noted the spots were macules, as opposed to petechiae. Macules are discolored spots on the skin that are not elevated above the skin surface. Dorlands Illustrated Medical Dictionary, 901 (25th ed. 1974). Petechiae are pinpointsized, nonraised, purplish red spots on the skin caused by intradermal or submucous hemorrhage. Dorlands Illustrated Medical Dictionary, 901 (25th ed. 1974). Dr. Neumann testified that purpura, which the hospital records indicate covered Sarah's body at the time of her death, is a larger area involved in the same sort of area that a petechia is. Dr. Rothrock explained that petechial rashes are commonly associated with neisseria meningitides (bacteria that are a prominent cause of meningitis), as opposed to macular rashes, which are rarely associated with neisseria meningitides. Dr. Rothrock indicated that if he were treating a four and one-half month old child with a fever of 103.6 and saw petechiae, he would have done a spinal tap, given intravenous antibiotics and admitted the child to the hospital.
The key to differentiating macules from petechiae is by pressing on the spot. Petichiae do not fade or blanch when pressed on. Dr. Neumann testified that the spots on Sarah blanched when he pressed on *835 them with his finger. He therefore determined the spots were macules. However, the medical chart does not indicate that the spot was either pressed on or did not blanch. Ms. Etcher, who was present during Dr. Neumann's examination of Sarah, denied that Dr. Neumann ever pressed on the spots, although she acknowledged that he touched them with his finger.
The jury also heard the testimony of Dr. Earl Smith, who was accepted by the court as an expert in the field of emergency medicine and who was chairman of the ACEP committee that developed the ACEP clinical policy guidelines. Dr. Smith agreed that for a child of Sarah's age, with her temperature, a CBC was not recommended by ACEP guidelines. However, Dr. Smith acknowledged that in treating children under the age of two with a fever of greater than 100.4, when the physician finds the presence of macules, the ACEP guideline is to obtain a CBC. This is not, however, the ACEP rule. Dr. Smith stated that if the rash Sarah had was petechial as opposed to macular, and was generalized as opposed to one or two lesions, in his opinion there is no question treatment would have been more aggressive.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Touchard v. Slemco Elec. Foundation, 99-3577, p. 5 (La.10/17/00), 769 So.2d 1200, 1204. Therefore, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the fact finder's conclusions were reasonable under the evidence presented. When a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Touchard, 769 So.2d at 1204.
Considering all of the medical evidence presented, it is clear that the jury was confronted with conflicting medical opinions on the question of the standard of care exercised by Dr. Neumann in his treatment of Sarah. The jury chose to accept the medical evidence supporting a conclusion that Dr. Neumann did not meet the standard of care in his treatment of Sarah. We cannot say the jury, based on its credibility determination, was manifestly erroneous. Thus, we cannot substitute our judgment for that of the jury.

CAUSATION
On the jury verdict form, the jury responded "YES" to the following questions:
Did Dr. Neumann's breach of the standard of care cause or contribute to a loss of chance of survival of Sarah Etcher?
Did Sarah Etcher lose a chance of survival of 50% or more as a result of Dr. Neumann's breach of the standard of care?
Defendants argue the jury's response to those questions was clearly wrong for the following reasons: 1) a white blood cell count obtained prior to Sarah's discharge on April 21, 1996, would not have altered the treatment and outcome; 2) a blood culture obtained prior to Sarah's discharge on April 21, 1996, would not have affected the treatment and/or the outcome; and 3) the administration of antibiotics would not have been required and there is no scientific support for plaintiffs' contention that antibiotics would have affected the outcome.
*836 The PCF likewise takes issue with the jury's verdict regarding causation arguing the jury erred in apparently concluding that a CBC performed in the emergency room on April 21, 1996, would, more probably than not, have revealed a white blood cell count of 15,000, and a bacterial infection. The PCF also argues the jury erred in apparently concluding a shot of the antibiotic Rocephin in the emergency room on April 21, 1996, would, more probably than not, have saved Sarah's life.
For the sake of clarity, we reiterate that a CBC is a complete blood count, which is a diagnostic test that allows a physician to analyze different components of the blood. In particular, the CBC allows a physician to determine the WBC, which is the white blood cell count. The results of a CBC are expeditiously available. A blood culture is a separate diagnostic test that involves placing a blood sample on a media culture and, after a period of time, testing the sample for bacterial growth. The results of a blood culture are typically available twenty-four hours after the blood is drawn. In this case, neither a CBC nor a blood culture was requested or performed on April 21, 1996.
If a CBC done on April 21, 1996, had shown a WBC of 15,000 or greater, according to Dr. Reinecke, the standard of care would have then required a blood culture and the administration of the antibiotic Rocephin. Dr. Miceli agreed. Dr. Mall explained that the general consensus of different literature is if the CBC showed Sarah's WBC was greater than 15,000, she should have had a blood culture and been administered antibiotics. However, Dr. Michael St. Romain of the medical review panel disagreed that a WBC of 15,000 or greater requires the administration of the antibiotic Rocephin. Likewise, Dr. Smith disagreed that an elevated WBC mandated that a physician do something, but did agree that in certain contexts an elevated WBC is useful in deciding treatment options. Dr. Smith explained that he would not do an isolated CBC; if he thought the child was sick enough, he would do further testing.
It is clear that a blood culture obtained on April 21, 1996, would have had no bearing on Sarah's treatment. The results of the blood culture would not have been available for twenty-four hours, which would have been after Sarah's death. Thus, the physician would have had to determine whether to administer antibiotics based on other factors.
In this case, a CBC was not obtained on April 21, 1996, therefore there is no way of knowing what a CBC done on that day would have shown. However, Dr. Reinecke opined that based on the height of Sarah's temperature on April 21st and on what eventually transpired, if a CBC had been done, the chances are 50% or greater that either the total WBC or the band count (the level of a type of white blood cell) would have been abnormal. Dr. Miceli stated he could not express an opinion on what a CBC would have shown on April 21, 1996, but agreed that the body's usual response to the presence of an infection is an elevation in the WBC. Dr. Miceli agreed, though, that one could assume that if bacteria were present in Sarah's body on April 21st, her WBC would have been elevated. However, he could not state with 100% certainty that this would have been the case. Dr. Rothrock stated that there is a one in three chance that Sarah's WBC would have been greater than 15,000 on April 21st.
Dr. St. Romain expressed his opinion that a CBC done on April 21st would not have shown anything. However, Dr. St. Romain agreed that the typical reaction of a body to an infection is to multiply the *837 WBC to fight the infection. Dr. St. Romain cautioned that this is not, however, the case with neisseria.
Dr. Rothrock testified that Rocephin is useful and potentially beneficial in the treatment of even the neisseria meningitides of which Sarah died. Dr. Miceli testified that the administration of Rocephin to a child who has occult bacteremia (bacteria in its blood stream that are alive and reproducing but are not readily identifiable), would more than likely increase the child's chances of survival. Dr. Miceli could not say, however, whether the administration of Rocephin to Sarah on April 21st would have increased her chances of survival to 100%. In Dr. Reinecke's opinion, if Sarah had received the appropriate dose of Rocephin on April 21, her chances of survival would have been greater than 50%.
When questioned about the effect antibiotics would have had on Sarah, Dr. Mall stated he would defer to an infectious disease specialist. Dr. Mall testified he had no reason to disagree with an opinion of an infectious disease specialist that Sarah would have had 100% recovery if she had been treated with antibiotics on April 21st.
Dr. Smith stated he would not disagree that if Sarah had received a dose of antibiotics on April 21st, her chances of survival would have increased. However, Dr. Smith did not believe there was any good data to support that position. He further testified he did not believe antibiotics would have increased Sarah's chance of survival much at all.
To establish causation in a situation where the patient dies, the plaintiff need only prove that the defendant's malpractice resulted in the patient's loss of a chance of survival. The plaintiff is not required to shoulder the unreasonable burden of proving the patient would have survived if properly treated. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1278 (La.1991). The question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 720 (La.1986). The jury's factual finding should not be reversed on appeal absent manifest error. Martin, 582 So.2d at 1278.
A thorough review of the record reveals that the jury's finding regarding causation was reasonable and based on credible and sufficient evidence. The evidence supports the jury's finding that Dr. Neumann's breach of the standard of care in treating Sarah contributed to a loss of chance of survival of Sarah and further that the breach caused Sarah to lose a 50% or greater chance of survival. Accordingly, we find no manifest error and will not disturb this portion of the judgment.

OBJECTION TO TESTIMONY
Plaintiffs' counsel questioned Dr. Mall as to whether antibiotics, if administered to Sarah on April 21, would have improved her chance of life. Dr. Mall responded that he would defer to an infectious disease specialist. Dr. Mall acknowledged reading the deposition of Dr. Mark Salzman, a pediatric infectious disease specialist. Plaintiffs' counsel then questioned Dr. Mall as follows:
Q. Okay. And per your memory, did [Dr. Salzman] very succinctly say that neisseria meningitidis is killed very easily by antibiotics; it's very susceptible to antibiotics? Do you remember reading that?
A. I believe so, yes, sir.
Q. Okay. And further, so with treatment before the symptoms start, there's no reason to think they're not going to respond, but once the bacteria has started *838 the cascade of events that causes sepsis and septic shock, at that time antibiotic treatment will not necessarily save you.
Defense counsel then objected and requested a bench conference. During that bench conference, defense counsel objected to plaintiffs' counsel reading a deposition in part as hearsay. The court ruled that if the testimony is material that was relied upon by an expert to arrive at his opinion, it is an exception to the hearsay rule. The court cautioned plaintiffs' counsel that if he read the deposition testimony, defense counsel would be given an opportunity to further question Dr. Mall and read the portions of the deposition testimony that she wished to read. The court then suggested that plaintiffs' counsel ask Dr. Mall about Dr. Salzman's testimony generally instead of reading from the deposition. Plaintiffs' counsel agreed to do so, and the court overruled the objection.
After the bench conference, plaintiffs' counsel asked Dr. Mall, "Do you have any reason to disagree with an opinion opined by an infectious disease specialist that this child would have had 100 percent recovery if she had been treated on the day of the 21st?" Dr. Mall responded, "No." On appeal, defendants complain that by allowing this question, the court allowed the introduction of hearsay testimony and that the ruling to allow such testimony was in error.
To preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or testimony and state the reasons for the objection. LaHaye v. Allstate Ins. Co., 570 So.2d 460, 466 (La.App. 3rd Cir.1990), writ denied, 575 So.2d 391 (La.1991). Defendants did not object to the question posed by plaintiffs' counsel after the bench conference. The objection urged during the bench conference was to plaintiffs' counsel reading portions of deposition testimony. Dr. Salzman's deposition was not offered in evidence, and, without any contemporaneous objection, there is no evidence that plaintiffs' counsel read from the deposition in posing the question after the bench conference. Thus, this issue was not properly preserved for review on appeal.

PEREMPTORY EXCEPTION RAISING THE OBJECTION OF NO RIGHT OF ACTION
The peremptory exception raising the objection of no right of action questions the plaintiff's standing or interest in the subject matter of the suit. LSA-C.C.P. art. 927A(5). The essential function of the objection is to provide a threshold device that questions whether a plaintiff has a right or legal interest in the claim sued on and whether a remedy afforded by law can be invoked by the plaintiff. Galjour v. Harris, 2000-2696, p. 8 (La.App. 1st Cir. 3/28/01), 795 So.2d 350, 356, writs denied, XXXX-XXXX and XXXX-XXXX (La.6/1/01), 793 So.2d 1229 and 1230, cert. denied, ___ U.S. ___, 122 S.Ct. 545, 151 L.Ed.2d 422 (2001). Defendants contend the trial court erred in twice overruling their peremptory exception raising the objection of no right of action challenging Mr. Young's right to bring wrongful death and survival actions.
The surviving father is authorized by LSA-C.C. arts. 2315.1 and 2315.2 to bring wrongful death and survival actions. Ms. Etcher testified she was married to David Etcher when Sarah was born and was still married to him at the time of trial, although she had not seen him in seven years. LSA-C.C. art. 184 provides that the husband of the mother is presumed to be the father of all children born or conceived during the marriage. Nothing in this record indicates that David Etcher *839 disavowed paternity of Sarah. Therefore, David Etcher is the legal father of Sarah by virtue of the presumption of LSA-C.C. art. 184. However, our analysis does not end here.
Both Ms. Etcher and Mr. Young maintain that there is no doubt that Mr. Young is Sarah's biological father. On January 24, 2000, Mr. Young executed a formal acknowledgement of paternity by authentic act attesting to that fact. In overruling the peremptory exception raising the objection of no right of action, the trial court noted that Louisiana law has recognized the concept of dual paternity and determined that the formal acknowledgment by authentic act executed by Mr. Young created a rebuttable presumption of Mr. Young's parentage. In our review of this record, there is, in fact, no evidence, to rebut Ms. Etcher and Mr. Young's position that Mr. Young is Sarah's biological father.
When considered in the context of a child bringing a wrongful death and survival action, the critical requirement is the biological relationship between the tort victim and the child. The child with a biological connection to the tort victim, whether a legitimate, legitimated or illegitimate child, has the right to bring an action for wrongful death and survival damages. Chatelain v. State, Dept. of Transp. and Development, 586 So.2d 1373, 1376 (La.1991). A child who is neither legitimate at birth, nor subsequently legitimated by the parent must, however, establish the filiation necessary to qualify as a child under LSA-C.C. art. 2315, within the time limitation imposed under LSA-C.C. art. 209. Chatelain, 586 So.2d at 1376.
Based on the analysis set forth in Chatelain, we conclude that, as is the case in considering the status as "child," when considering the status as "parent" under LSA-C.C. arts. 2315.1 and 2315.2, the critical requirement is the biological relationship between the tort victim and parent. We find support for this conclusion in the case of Gnagie v. Department of Health and Human Resources, 603 So.2d 206 (La. App. 1st Cir.), writ denied, 608 So.2d 174 (La.1992). In determining, ex proprio motu, that Mr. Gnagie had no right to bring a survival or wrongful death action for the child's death, this court stated:
[W]e hold that, with respect to entitlement to bring wrongful death and survival actions ... the legal fiction of paternity created by virtue of LSA-C.C. arts. 184 and 189 may be refuted or overcome by sufficient evidence that the legal father is not the biological father. Where the evidence is so overwhelming that the legal father is not the actual biological father ... this court will allow the legal fiction to be overcome in the interest of justice.
Gnagie, 603 So.2d at 214.
In this case, both Ms. Etcher and Mr. Young attested to Mr. Young's biological link to Sarah. Moreover, Mr. Young's acknowledgement of Sarah by authentic act effectively created a presumption of biological parentage. See Rousseve v. Jones, 97-1149, p. 7 (La.12/2/97), 704 So.2d 229, 232-233. Based on the rationale of Chatelain and Gnagie, we find that the fact that Sarah has a "legal father" by virtue of the presumption of LSA-C.C. art. 184, does not preclude the biological father from recovering benefits as Sarah's father under LSA-C.C. arts. 2315.1 and 2315.2.
Defendants take issue with the fact that Mr. Young did not try to adopt Sarah while she was living and did not formally acknowledge her until after she died, and then only after a pleading was filed challenging his right to recover money because of her death. We note that Sarah lived only four and one-half months. Moreover, defendants have neither pointed out to this *840 court, nor have we found any prescriptive statute applicable to a father's action to acknowledge his biological child. This court has stated that a biological parent who knows of or has reason to know of the existence of his biological child and who fails to assert his rights for a significant amount of time, cannot come forward later and assert paternity. Smith v. Jones, 566 So.2d 408, 414 (La.App. 1st Cir.), writ denied sub nom., Kemph v. Nolan, 569 So.2d 981 (La.1990). That statement was made, however, with respect to a biological father's right to avowal in certain circumstances. This is not, however, an avowal case.
This assignment of error is without merit.

SURVIVAL ACTION
Defendants contend there was no evidence to support the award of damages for pain and suffering to Sarah. They contend that any pain and suffering Sarah experienced resulted from the disease and the treatment required for the disease.
A jury may award damages for pain and suffering in a survival action where there is the smallest amount of evidence of pain, however brief, on the part of the deceased, based on his actions or otherwise; factors to be considered in assessing quantum for pain and suffering are the severity and the duration thereof. Samuel v. Baton Rouge Gen. Med. Center, 99-1148, p. 4 (La.App. 1st Cir. 10/2/00), 798 So.2d 126, 129, writs denied, XXXX-XXXX and XXXX-XXXX (La.6/23/00), 765 So.2d 1044 and 1066. The survival action permits recovery only for damages actually suffered by the deceased from the time of injury to the moment of death, including pain and suffering, loss of earnings, and any other damages sustained before death. Samuel, 798 So.2d at 129. Where there is no indication that a decedent consciously suffered, an award for pre-death pain and suffering should be denied. Samuel, 798 So.2d at 129.
The question of whether the decedent actually suffered is a factual issue. The appellate court's review of factual findings is governed by the manifest errorclearly wrong standard. Samuel, 798 So.2d at 130.
After Dr. Neumann discharged Sarah from the emergency room on April 21, 1996, Ms. Etcher took Sarah to Mr. Young's house. Ms. Etcher testified that Sarah laid on a quilt on the floor and touched a few of her toys. Ms. Etcher explained that Sarah seemed very tired. Ms. Etcher gave Sarah a bottle and put her to bed at 8:30 or 9:00 p.m. At approximately 4:45 a.m. the next morning, Sarah was restless. It was then that Ms. Etcher noticed the purplish-red blotches on Sarah's face, stomach and arms.
When Ms. Etcher arrived with Sarah at the emergency room on April 22, 1996, someone working for the hospital took Sarah and told Ms. Etcher to wait outside of the room. Ms. Etcher testified that five or six people were in the room "putting tubes in her." Ms. Etcher was allowed to see Sarah for a moment. Ms. Etcher explained, "[Sarah] was really out of it. She had tubes sticking all out of her and one eye was partially open, and I asked what was wrong with her eye and they said that they had given her some medicine to knock her out a little bit, because she was in a lot of pain." Sarah was then transported by ambulance to Our Lady of the Lake. Ms. Etcher stated she rode in the front of the ambulance "because they had to keep resuscitating [Sarah] because her heart kept failing."
Generally, survival damages are warranted if plaintiff presents any evidence ("a scintilla") of pain or suffering on the *841 part of the decedent. Giammanchere v. Ernst, 96-2458, p. 6 (La.App. 4th Cir. 5/19/99), 742 So.2d 572, 575, writs denied, 99-2924 and 99-2928 (La.12/17/99), 751 So.2d 881 and 882. Here, plaintiffs presented evidence through the testimony of Ms. Etcher that Sarah experienced pain and suffering. The testimony at trial did not establish that Sarah would have experienced that pain and suffering as a result of the disease even if there was no breach of the standard of care. We thus find no manifest error in the jury's determination that Sarah experienced pain and suffering prior to her death and awarding damages for that pain and suffering.

QUANTUM[3]
The discretion vested in the trier of fact is "great," even vast, so an appellate court should rarely disturb an award of general damages. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Youn, 623 So.2d at 1260.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point, reasonably within that discretion. Youn, 623 So.2d at 1260.

Damages Awarded for Survival Action
The jury awarded $50,0000 in damages for pain and suffering experienced by Sarah prior to death. The PCF argues this is excessive. Considering Ms. Etcher's testimony previously set forth, we find no abuse of the jury's vast discretion in making such an award. Accordingly, we will not alter the award on appeal.

Damages Awarded to Ms. Etcher for Wrongful Death Action
The elements of damage for a wrongful death action are loss of love, affection, companionship, and support and funeral expenses. Scott v. Pyles, 99-1775, p. 17 (La.App. 1st Cir. 10/25/00), 770 So.2d 492, 504, writ denied, XXXX-XXXX (La.1/26/01), 782 So.2d 633. The jury awarded Ms. Etcher damages totaling $500,000. Defendants and the PCF contend this award is excessive.
Ms. Etcher testified regarding her pregnancy and Sarah's birth. She explained that Sarah was a happy baby that demanded a lot of attention. Ms. Etcher stated she liked that and she loved babies. Ms. Etcher stated she watched Sarah all the time and took Sarah with her when she went out. Sarah stayed with Mr. Young's mother once during dinner, but never went to a babysitter. According to Ms. Etcher, Sarah made she, Mr. Young and Ms. Etcher's two children by David Etcher a unit.
Ms. Etcher testified that after Sarah died, she was not allowed to hold her child. Ms. Etcher and anyone who had been in *842 contact with Sarah in the twenty-four hours prior to her death had to take medicine because Sarah's illness was highly contagious. In fact, anything Sarah touched or wore had to be disposed of right away, even before Sarah's funeral. Ms. Etcher stated all of this tore she and her family apart.
Ms. Etcher also testified that she and Mr. Young experienced problems with their relationship after Sarah died. Mr. Young wanted a family, but Ms. Etcher had undergone a tubal ligation on the day Sarah was born. Ms. Etcher explained that surgery to reverse the procedure was cost prohibitive.
While the damage award to Ms. Etcher may be high, we do not find it so high as to be an abuse of discretion by the trier of fact. Accordingly, we will not alter the award.

CONCLUSION
For the reasons set forth herein, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants.
NOTES
[1] Hon. Ian W. Claiborne, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Under the Louisiana Medical Malpractice Act, which applies to actions against private health care providers, a party can recover only $500,000.00 in general damages for malpractice claims.
[3] In their appeal brief, plaintiffs contend the damages awarded to Mr. Young are abusively low and should be increased. However, plaintiffs did not file an answer to the appeal or a cross-appeal. We are thus precluded from addressing the claim. LSA-C.C.P. arts. 2082 and 2133.