PAUL C. GENCO AND MARY G. GENCO
v.
TONY NOTO, JR. AND PERCY HARRIS
No. 2007 CA 1990.
Court of Appeals of Louisiana, First Circuit.
August 21, 2008.
CHARLES V. GENCO, D. MARK VALENTINE, AMITE, Louisiana, Counsel for Plaintiffs/Appellants Paul C. Genco and Mary Genco.
J. PARKER LAYRISSON, New Orleans, Louisiana, Counsel for Defendant/Appellee Tony Noto, Jr.
Before: GAIDRY, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
This is an appeal by the plaintiffs from a judgment in favor of the defendant relating to the construction of a concrete driveway to the plaintiffs' home. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
The plaintiffs, Paul C. Genco and Mary G. Genco, orally contracted with the defendant, Tony Noto, Jr., to construct a large concrete driveway adjacent to their newly constructed home. Shortly after the concrete was poured on September 3, 2004, a heavy rain fell, which resulted in aesthetic problems with the driveway. The plaintiffs were dissatisfied with the appearance of the driveway, despite several attempts by the defendant to correct it to the plaintiffs' satisfaction. Consequently, the plaintiffs filed suit against Mr. Noto for damages asserting that he failed to satisfactorily complete the concrete slab in a professional, quality and workmanlike manner. Mr. Noto answered the petition raising the affirmative defense of extinguishment of the obligation and also filed a reconventional demand asserting that he performed in accordance with the oral agreement and that the plaintiffs breached the contract by failing to act in good faith. Following a one-day trial, the trial court concluded that Mr. Noto completed the work he was contracted to do, thereby extinguishing his obligation under the contract. Thereafter, judgment was signed in favor of the defendant and against the plaintiffs and dismissing all other claims with prejudice. The plaintiffs appealed, asserting that the trial court improperly applied certain Civil Code articles and erred in discounting the plaintiffs' evidence.

DISCUSSION
The facts in this matter are essentially not in dispute. It is undisputed that Mr. Genco asked Mr. Noto to frame and pour a concrete parking area of approximately five thousand square feet on a hill leading to the plaintiffs' house. It is also clear that Mr. Genco initially requested a rough broom finish on the driveway. When asked to do the project, Mr. Noto at first stated that he did not have the time, but he subsequently agreed, stating that he could do it that week. The parties also agreed that Mr. Genco would be responsible for the materials and Mr. Noto would be in charge of the "pour."
It is undisputed that on the morning of the pour, Mr. Genco called and cancelled the cement trucks, which Mr. Noto had reserved for early that morning. Mr. Genco testified that when he got up that morning and saw the weather report of a 30% to 40% chance of rain, he called the concrete company at about 6:45 a.m. and cancelled the pour. Mr. Genco did not notify Mr. Noto prior to cancelling. Therefore, when Mr. Noto arrived at Mr. Genco's home for the early morning pour, he was unaware that the cement trucks had been cancelled. When Mr. Noto asked Mr. Genco why he cancelled the cement trucks, Mr. Genco told Mr. Noto that it was probably going to rain. Mr. Noto agreed, but explained that afternoon thunderstorms are always possible and that was why he scheduled to have the trucks there at daybreak to pour early in the morning. According to Mr. Noto, if the trucks had arrived at daybreak, they would have been gone by 11:00 to 11:30 a.m. and he would have been finished at about 1:00 p.m.
Nevertheless, Mr. Noto told Mr. Genco not to worry and that he could "handle it." Mr. Noto called to get the trucks back. However, because Mr. Noto lost the first pour of the day, when the trucks were cancelled and moved to another job, the trucks sent to the site were "spot" trucks, and were delivered as they became available, delaying the time between the trucks and delaying the completion of the pour. The last cement truck left the job site between 1:30 and 2:00 p.m. Mr. Noto stated that at that point, the top sides of the driveway had already been broom swept. The middle section was the last section poured, which had been setting about one hour when it began to rain around 3:30 or 4:00. The rain was heavy, and Mr. Noto testified that he covered the driveway with plastic sheeting. However, Mr. Noto acknowledged that the rain caused some pecks in the driveway and that water ran under the plastic sheeting, especially toward the bottom, since the driveway was located on a hill.
Mr. Noto further testified that as long as there was not a chance of rain in the morning, no one in the area would stop a pour for a 30% chance of afternoon scattered thundershowers. Mr. Noto stated that he tried to correct the pecks the rain had made for about two hours after it stopped raining and then decided to wait until the next morning. The next day, Mr. Noto bought approximately twenty bags of Portland cement and broom finished the texture. He went back several times thereafter to try to fix the driveway to Mr. Genco's satisfaction. Mr. Noto stated that at that point, all that was left to do with the rough broom finish was to let the driveway dry and blend together and to drive on it to help even it out. Mr. Noto admitted, however, that the appearance of the driveway would have been better without the rain. He stated that the broom finish was fair and would have evened out and improved with time.
However, according to Mr. Noto, Mr. Genco did not want to give it time and asked Mr. Noto to grind off the broom finish in an attempt to blend the finish. As a result of this change, Mr. Noto stated that his cement finisher, Zed Bland, worked for three or four days with the grinder, but that Mr. Genco was still not satisfied and asked Mr. Noto to leave. Mr. Noto estimated that he spent more than $3,000 trying to finish the job to Mr. Genco's satisfaction. Further, it was Mr. Noto's opinion that it was the grinding that caused the problem with the appearance.
Mr. Genco testified that he wanted a rough broom finish to the driveway, but that the rain washed off the top layer of the cement leaving the gravel exposed. He stated that he told Mr. Noto that he wanted it fixed and admitted that he asked Mr. Noto to use the grinder to fix the appearance of the driveway. Mr. Genco testified that he worked with Mr. Noto and Zed Bland for two or three days to improve the look of the driveway using the grinder, but then asked Mr. Noto to leave. Mr. Genco then hired Mr. Bland himself to continue the grinding. Mr. Genco testified that after Mr. Noto left the job, he spent $1,700 of his own money to repair the driveway, but that he was still unhappy with the surface of the driveway. However, Mr. Bland testified that after four days of work, Mr. Genco told him that "he was satisfied with it."
Lucy Bellavia, an expert in concrete pouring and in finishing concrete, testified on behalf of the plaintiffs. She stated that her company poured the slab for the plaintiffs' house. She stated that while there was nothing wrong structurally with the driveway slab poured by the defendant, there were problems aesthetically. She explained that there were pecks in it. She also stated that it was possible to "somewhat" buff out a problem caused by rain. It was her opinion that the rain caused the problem. On cross-examination, Ms. Bellavia admitted that a grinder can also cause pecking.
Torn Pittman, Mr. Noto's expert civil and structural engineer, testified that Mr. Noto called him and told Mr. Pittman that he had a little problem with a rain. Mr. Pittman advised Mr. Noto to get some Portland cement to fix it. Mr. Pittman stated that Mr. Noto did everything he should have to correct the rough broom finish. If it had been left alone, Mr. Pittman believed that the driveway would have "cured a lot more" and "looked a lot better." However, when Mr. Pittman saw the driveway after the grinding, he stated that it looked "terrible." He did not believe that the rain caused what he saw. It was his opinion that the remedial efforts worsened the appearance of the driveway.
In written reasons, the trial court stated:
The Court observes that the application of Louisiana Civil Code Article 1854 is merited in this case, especially in light of the testimony of plaintiff's own expert witness, Lucy Bellavia. Ms. Bellavia testified regarding the completeness and soundness of the job, and could not tell the Court whether the rain or the grinding or both, caused the aesthetic impairment in the driveway. Therefore, the defendant performed the contract of pouring the concrete driveway for the plaintiffs and extinguished his obligation under the contract, in spite of Mr. Genco's interference with the performance of the job. The Court notes that Mr. Genco injected himself into the work by canceling the concrete order on the day of the "pour", by insisting on having the concrete grinding done afterwards and by ordering the defendant to leave the work site. The defendant completed the work he contracted to do with the plaintiff and will not be penalized by the Court.
On appeal, the plaintiffs assert that the trial court committed legal error when it applied incorrect principles of law. In particular, the plaintiffs contend that the trial court improperly applied LSA-C.C. arts. 1873 and 1854.
Specifically, with regard to Article 1873, the plaintiffs argue that when Mr. Nato assumed the risk of rain, he became liable for his failure to perform. According to LSA-C.C. art. 1873 an obligor is not liable for his failure to perform when it is caused by a fortuitous event that makes performance impossible. An obligor is, however, liable for his failure to perform when he has assumed the risk of such a fortuitous event. LSA-C.C. art. 1873. The expression "fortuitous event" in Article 1873 implicitly encompasses the expression "irresistible force" and the event must be such as to make performance truly impossible. See Comments (c) and (d), LSA-C.C. art. 1873, Revision Comments  1984. Because performance was not impossible herein, and did in fact take place, we disagree with the Gencos that LSA-C.C. art. 1873 is applicable herein.
The salient issue is found in the Gencos' second assignment of error. The Gencos assert that the trial court incorrectly applied LSA-C.C. art. 1854 when it determined that Mr. Noto fulfilled the contract. Specifically, the Gencos contend that the obligation was not extinguished because Mr. Noto's performance was defective.[1]
Article 1854 provides that "[p]erformance by the obligor extinguishes the obligation." As used in this Article, "performance" means the performance called for by the obligation. See Comment (b), LSA-C.C. art. 1854, Revision Comments  1984. The Gencos contend that the contractual commitment was for a driveway with a rough broom finish and created in a quality workmanlike manner free from damage caused by rain.
The trial court concluded that Mr. Noto performed under the contract thereby extinguishing his obligation. Based on credibility determinations and implicit in the trial court's ruling is a finding that Mr. Noto's performance was not defective. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inference of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and references are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Thus, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Under such circumstances, an appellate court cannot substitute its judgment for that of the trier of fact. Etcher v. Neumann, 00-2282, p. 9 (La.App. 1 Cir. 12/28/01), 806 So.2d 826, 835, writ denied, 02-0905 (La.5/31/02), 817 So.2d 105. Upon a thorough review of the record in this matter, we cannot say that the trial court was manifestly erroneous or clearly wrong. See Stobart v. State, Dep't of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). Accordingly, the judgment of the trial court is affirmed.

CONCLUSION
Considering the above, we affirm the judgment of the trial court. Costs of this appeal are assessed against the plaintiffs.
AFFIRMED.
NOTES
[1] An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance. LSA-C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. LSA-C.C. art. 1995.