850 So.2d 1077 (2003)
Juanita June STRANGE and James Strange, Plaintiffs-Appellants,
v.
Pankaj SHROFF, M.D., Russell O. Cummings, Jr., M.D.; Russell O. Cummings, Jr., M.D., A Professional Medical Corporation; Hospital Service District No. 1 of Caldwell Parish d/b/a Citizens Medical Center, Defendants-Appellee.
No. 37,353-CA.
Court of Appeal of Louisiana, Second Circuit.
July 16, 2003.
*1079 Rodney G. Cater, David J. Foshee, New Orleans, for Appellants.
Donald J. Anzelmo, Monroe, for Appellee.
Before BROWN, STEWART and CARAWAY, JJ.
CARAWAY, J.
This medical malpractice action stems from a patient's untimely discharge from the hospital following surgery. The patient's primary doctor and internist, who admitted her to the hospital, did not directly consult with the surgeon concerning the propriety of the patient's discharge. Within a few hours after the discharge, due to complications from the surgery, the patient was hospitalized again with life-threatening conditions requiring an emergency second surgery. Following a jury trial, the jury determined that no malpractice occurred, and the patient and her husband *1080 appeal. Finding no manifest error in the ruling, we affirm.

Facts
On May 12, 1992, Juanita Strange of Columbia, Louisiana, visited the local office of Dr. Pankaj Shroff, her regular internist. She complained of lower abdominal pain which had persisted for a few days. The next day the pain worsened and, pursuant to Dr. Shroff's instructions, she went to Citizens Medical Center Emergency Room in Columbia, where Dr. Shroff examined her, ordered diagnostic tests, and admitted her to the hospital. Dr. Shroff also requested a surgical consultation from Dr. Russell Cummings. Dr. Cummings testified that his examination was essentially negative except for some tenderness on the right side of Mrs. Strange's abdomen. Her abdominal x-ray did not reveal an obstruction, nor did Dr. Cummings initially suspect an obstruction.
Because of her pain and the possibility of acute appendicitis, Dr. Cummings operated on Mrs. Strange on May 14, 1992, the day after her admission to the hospital. The exploratory laparotomy consisted of lysis of pelvic adhesions and removal of a right ovarian cyst. Dr. Cummings testified that the adhesions, which were bound down Mrs. Strange's right side, were the source of her abdominal pain. Dr. Shroff and Dr. Cummings both followed Mrs. Strange post-operatively and saw her each day during their rounds, except for a four day interval when Dr. Shroff attended a medical conference.
Dr. Cummings testified that Mrs. Strange recovered as expected immediately following surgery, but when she started eating again, she had problems with abdominal distension and vomiting. On May 19, 1992, a second abdominal x-ray was ordered by Dr. Cummings. The x-ray revealed a paralytic ileus or a possible partial small bowel obstruction. Dr. Cummings testified that an ileus is impaired motility of the intestine, and that any abdominal surgery can cause the bowel to be paralyzed for a certain length of time. As normal bowel activity resumes, bowel sounds are present and the patient begins to pass gas and have bowel movements. Dr. Cummings also stated that after surgery it is common for adhesions to reform causing an intestinal blockage.
After the second x-ray, during the night and early morning of May 21-22, Mrs. Strange vomited a large quantity of liquid. Dr. Cummings explained that the vomiting was still consistent with an ileus, rather than a partial obstruction. In spite of the vomiting, Mrs. Strange had flatus and passed stool, both of which indicated post-operative improvement. Dr. Cummings testified that he ordered no further x-ray because by the morning of May 23, when he last saw Mrs. Strange, there was no clinical evidence of an impending problem with ileus or blockage.
On May 22, Dr. Shroff ordered blood work after the vomiting episode. Plaintiffs' expert witness, Dr. Bruce Samuels, testified at trial that most of the laboratory tests were normal, although the results of the Complete Blood Count profile ("CBC") were not normal. Mrs. Strange's BUN, creatinine and electrolytes were all within normal limits. Dr. Samuels, who is an internist, testified that Dr. Shroff's action in ordering the blood work after the vomiting met the appropriate standard of care.
Mrs. Strange was discharged from Citizens on Saturday, May 23, 1992. Dr. Cummings saw her at 8:30 that morning during his rounds. Dr. Cummings testified that he did not feel that Mrs. Strange was ready to go home because she still required pain medication and because of the prior vomiting episode. Nevertheless, Mr. and Mrs. Strange both reported to Dr.
*1081 Cummings their desire to go home. Dr. Cummings' entry in the physician's progress record on the date of Mrs. Strange's discharge from Citizens reflected the following:
5-23 Had 2 pain shots last night wants to go homestop pain meds try Anaprox DS prn pain. JC
The charge nurse, Suzanne Allen, accompanied both Dr. Cummings and Dr. Shroff on their rounds that day. After Dr. Cummings saw Mrs. Strange, she entered the following nurse's progress note:
At 8:30 Dr. Cummings visited. New orders were noted. Encouraged to ambulate. Lungs clear. Abdomen soft with audible bowel sounds noted. No complaints of nausea and vomiting this a.m. Heplock intact left forearm. Site healthy. Ambulating in hall with husband. Tolerated well. S. Allen
At 11:30 that morning another nurse removed Mrs. Strange's staples. Ms. Allen's next progress note entered at 12:00 noon reflected that Mrs. Strange was in bed, and her pulse and respirations were slightly elevated. Ms. Allen attributed this to Mrs. Strange's walking in the hallways. Ms. Allen noted that Mrs. Strange "states [she] wants to go home."
Ms. Allen made rounds with Dr. Shroff shortly before 1:00 p.m. and testified at trial as follows:
... as we're going down the hall or at the nurses station, I usually kind of fill him in with what's going on with the patients or as we're making rounds I let him know before we go in the patient's room. I told him that she had been insistent or adamant, actually, about going home all day. I told him what Dr. Cummings had said that morning that, uh, she had wanted to go home but he didn't feel comfortable at that time of her going home because she had just received some IM pain medicine and wanted her to try some pain medicine by mouth, which he had ordered....
Ms. Allen told Dr. Shroff that Mrs. Strange had neither reported any pain nor requested any pain medication since early that morning. Dr. Shroff instructed Ms. Allen to retake Mrs. Strange's vital signs while they were on rounds, and her pulse and respirations had gone back down to normal. Ms. Allen entered the following note in the chart:
1:00 p.m. Dr. Shroff visited. Heplock discontinued intact and bandaid applied. New orders noted. Temp 97, pulse 92, respirations 22, blood pressure 140/80. Prescription given per Dr. Shroff with instructions. S. Allen
1:55 p.m. To car per wheelchair accompanied per nurses aide and husband. Discharge instructions given. Left in stable condition. S. Allen
Dr. Shroff testified as follows concerning his recollection of the events that led to Mrs. Strange's discharge:
This is the ten[th] day after surgery. I saw the record. She had been medicated earlier in the morning, but since then she has been ambulating. I talked to the nurses. She said that she had been ambulating in the halls multiple times. She had ate about fifty (50%) of her breakfast. She ate about seventy-five (75%) of her lunch. She did not has [sic] thrown up. And she is feeling good. And, uh, when I went in there to see, she just said she wants to go home. So, uh, I wanted to examine her and see what is going on there. Her examination was completely normal. She had no pain since earlier that morning. She had not taken any other oral pain medication. As I said, she ate very well. She had no distension of her bowel movements. She had no tenderness in the abdomen. She had good bowel *1082 movements. So, I sit down, I give them the instructions. And told them what they need to do if they go home. I also talk to her husband when he was sitting beside her and give all the instructions. I gave him the prescriptions. Also told them that if she goes home, she starts having some nausea, vomiting, or she cannot eat or drink, bring her right back here....
Dr. Shroff testified as follows concerning his discharge summary:
Well, from the Dr. Cummings note, my examination on that day, I had no reason for her to be staying here and she wanted to go home, also, which (inaudible). The patient was stable. There was no sign of any complications.
Dr. Shroff's discharge summary further stated "Per Dr. Cummings, she was surgically stable to go home." When questioned at trial about what this meant, he explained that he reviewed Dr. Cummings' note from that morning, and together with his own examination and previous experience working with Dr. Cummings, "... the patient was stable enough to go." Dr. Shroff testified: "[Dr. Cummings] did not order anything. So, I, and from my examination I knew there was nothing of his concern. And he did not even call me or did not put anything in the chart that he has any concern about the patient."
The same nurse, Ms. Allen, received a phone call at Citizens later that afternoon, concerning which she testified as follows:
A Okay. I'm not sure of the accurate time, uh, it was probably between four and five, five or five-thirty. I received a phone call. Mr. Strange asked to speak to the doctor, either Dr. Shroff or Dr. Cummings, and I told him that they weren't in the building. And he told me that she was not feeling well. And I asked him, I asked him if she had gone home and over done it, is what I asked him. And he said, and he said, No, She's just not feeling good. She's real weak. And I asked him, you know, what was going on. And he said, Well, she's just real, real weak and she's not feeling good. And I said, Well, then you need to bring her back to the emergency room. The doctor had already instructed her on that if she, you know, had any problems to come to the emergency room. And I told him to bring her back. And he said okay. But they never showed up.
Q Did Mr. Strange indicate to you when he first noticed that he wife wasn't doing well after she was home?
A He told me that he had left and gone to the drugstore to get her medicine, and when he came back she was real weak.
Mr. Strange's testimony regarding the afternoon of his wife's discharge from the hospital was contrary to that of Ms. Allen, Dr. Shroff and the medical records. He indicated that he and his wife knew that she was too weak to go home. He said that as they left the hospital, Mrs. Strange "was so sick" that he had to take her to their house before he could go to the pharmacy to fill her prescriptions. Prior to contacting the Citizens' nurse, he said that Mrs. Strange was "continuously hollering and getting worse." Mr. Strange testified that his brother-in-law was at his home helping to attend to his sister and that after the telephone call to Citizens, he suggested that Mr. Strange take Mrs. Strange instead to the emergency room at St. Francis Hospital in Monroe.
When Mrs. Strange arrived at St. Francis at 7:46 p.m., she was acutely ill. The internist on call, Dr. Thomas Gullatt, testified that she was "mortally tachypneic" *1083 and had "severe metabolic acidosis with associated hyperglycemia, possible diabetic ketoacidosis, possible peritonitis and bowel obstruction or bowel strangulation, intravascular volume depletion and possible septic shock." Mrs. Strange, who is diabetic, was transferred to ICU, where Dr. Frank Sartor, a surgeon, evaluated her abdomen. After she was medically stabilized, Dr. Sartor performed surgery for a bowel obstruction consisting of a bowel resection and lysis of adhesions. Mrs. Strange's post-operative hospitalization at St. Francis from May 23 through July 15, 1992, was characterized as "stormy."
The plaintiffs filed suit against Dr. Shroff, Dr. Cummings, and Citizens alleging the misdiagnosis of her post-operative condition and premature discharge from the hospital. Following the dismissal of Dr. Cummings and Citizens, the case proceeded to a trial by jury against Dr. Shroff. At the conclusion of the trial, the jury answered the following interrogatory in the negative:
Do you find from a preponderance of the evidence that the treatment rendered to Juanita Strange by Dr. Pankaj Shroff fell below the standard of care ordinarily practiced by other specialists in his field acting under similar circumstances and that this breach in the standard of care was the sole proximate cause or a contributing cause of the damages sustained by the plaintiffs?
The plaintiffs' suit against Dr. Shroff was therefore dismissed.
On appeal, the plaintiffs make two assignments of error. They assert that the trial court erred by refusing to grant their motion in limine to prevent testimony relating to the fault of Dr. Cummings. Secondly, they assert that the trial court erred in denying their motion for judgment notwithstanding the verdict (JNOV) and that the jury's verdict was manifestly erroneous and clearly wrong.

Motion in Limine
At the beginning of the trial, plaintiffs sought a ruling to preclude the introduction of evidence of Dr. Cummings' fault. Plaintiffs argued that Dr. Shroff would attempt to exculpate himself at trial by showing that Dr. Cummings failed to communicate to Dr. Shroff his opposition to Mrs. Strange's discharge. Plaintiffs argue that the dismissal of Dr. Cummings from the suit by a summary judgment exonerated him and that Dr. Shroff should not be permitted to allege any of Dr. Cummings' fault at trial. The trial court denied the motion in limine, ruling that "although no mention may be made of any breach of a standard of care [by Dr. Cummings], whatever is in the medical records or not in the medical records can be referred to." Later, during the cross-examination of plaintiffs' medical expert, we note that plaintiffs' counsel stipulated that Dr. Cummings did not deviate from the standard of care of a surgeon and Dr. Shroff did not dispute that stipulation.
The issue of Dr. Cummings' fault was never at issue or placed before the jury to decide. Nevertheless, the trial court, when faced with the motion in limine, had to determine the relevance of Dr. Cummings' actions or inaction regarding his and Dr. Shroff's patient. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401.
In this case, Dr. Cummings' collaborative actions with Dr. Shroff and their communications and non-communication regarding Mrs. Strange were relevant evidence for the determination of Dr. Shroff's alleged malpractice. Vital to the plaintiffs' *1084 case was Dr. Cummings' position that he would not have discharged the patient on May 23. From our review of the evidence, the subsequent cross-examination and review of Dr. Cummings' actions by the defense were relevant inquiries, and the trial court's refusal to grant the motion in limine was proper.

Medical Malpractice
To establish a medical malpractice claim, the plaintiff must prove by a preponderance of the evidence the following elements as set forth in La. R.S. 9:2794(A):
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom. Pfiffner v. Correa, 643 So.2d 1228 (La.10/17/94); Sewell v. United States, 629 F.Supp. 448 (W.D.La.1986).
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Etcher v. Neumann, 00-2282 (La.App. 1st Cir.12/28/01), 806 So.2d 826; writ denied, 02-905 (La.5/31/02), 817 So.2d 105, citing Rosell v. ESCO, 549 So.2d 840 (La.1989); Satterwhite v. Reilly, 35,926 (La.App.2d Cir.5/8/02), 817 So.2d 407; writ denied, 02-1552 (La.9/30/02), 825 So.2d 1193, citing Stobart v. State, Through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Etcher v. Neumann, supra. Therefore, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable under the evidence presented. Id. The appellate court should not substitute its opinion for the conclusions made by the trial court, which is in a unique position to see and hear the witnesses as they testify. Satterwhite v. Reilly, supra.
The question posed for the jury's consideration at the end of trial was in a single interrogatory addressing all elements of proof of the malpractice claim required by La. R.S. 9:2794(A)standard of care, breach, and cause-in-fact. Likewise, by rejecting plaintiff's motion for JNOV, the trial judge upheld the verdict against the plaintiff, finding that the jury could conclude that one or more of the elements was not supported by competent evidence and that the verdict was not *1085 wholly unreasonable. The rigorous standard regarding JNOV is based upon the principle that "when there is a jury, the jury is the trier of fact." Scott v. Hosp. Serv. Dist. No. 1 of St. Charles Parish, 496 So.2d 270, 273 (La.1986). Therefore, we will likewise review whether the jury was manifestly erroneous or clearly wrong in determining that any one or all of the elements for this malpractice claim was not established by the plaintiffs.

Cause-In-Fact
The cause-in-fact inquiry asks whether Mrs. Strange "suffered injuries that would not otherwise have been incurred" but for her discharge from the care of a hospital on May 23. By 7:46 p.m., when Mrs. Strange reached the St. Francis emergency room, she was in shock. Her complications of dehydration, diabetic acidosis, tachycardia, and low blood pressure which developed in the 5-1/2 hours since her discharge from Citizens would clearly not have been serious and life-threatening had she remained hospitalized. Dr. Shroff admitted in his testimony that those serious complications would have been prevented by IV fluids and the monitoring of Mrs. Strange's vital signs and blood conditions in a hospital.
On the other hand, the area of Mrs. Strange's small intestine, which Dr. Sartor later removed after finding it to be "non-viable," and the adhesions which caused the intestinal obstruction were internal problems which were caused by the initial surgery and which were present, yet undetected, upon Mrs. Strange's discharge at 2:00 p.m. Although plaintiffs' expert, Dr. Samuels, suggested that the second surgery and the removal of the portion of the small intestine may have been avoidable, we find from the weight of the other medical evidence that the jury could reasonably conclude that the second surgery was inevitable at the time of the 2:00 p.m. discharge and that both Drs. Shroff and Cummings had not fallen below the standard of care for their failure to have detected those problems on the morning and early afternoon of May 23. Plaintiffs present no argument in this appeal that the jury was manifestly erroneous in rejecting their claim that Dr. Shroff misdiagnosed or failed to properly act with regard to the ileus and partial bowel obstruction prior to the time of her discharge and, as noted above, they stipulated that Dr. Cummings met the standard of care.
Despite Dr. Shroff's admission that Mrs. Strange's complications would have been controlled had she remained in the hospital, the causation issue is complicated by the impact of the extensive delay caused by Mrs. Strange's decision to go to St. Francis instead of returning immediately to Citizens. The nurse, Ms. Allen, testified that as early as 4:00 p.m., two hours after Mrs. Strange's discharge from the hospital, she received Mr. Strange's phone call concerning his wife's deteriorating condition. She instructed him to return immediately to Citizens, which, in the small town of Columbia, could have occurred quickly. Consequently, the jury could view the evidence as containing an unexplained delay of over three hours before Mrs. Strange obtained medical aid. The grave complications present at 8:00 p.m., when the doctors at St. Francis were struggling to acquaint themselves to their new patient's condition and medical history, were clearly not the conditions which Mrs. Strange would have presented at Citizens at 4:30 p.m.
Based upon this view of the evidence of causation, we are constrained to find that the jury was not clearly wrong in concluding that the complications which were present upon Mrs. Strange's arrival at St. Francis were caused by the unreasonable *1086 delay which occurred in the three-hour period after Ms. Allen instructed her to return to the hospital. Since we recognize that this causation issue presents a close question, a review of the standard of care issue concerning Dr. Shroff's decision to discharge Mrs. Strange further supports our determination that the jury's verdict is not manifestly erroneous. Therefore, we will additionally review that issue.

Standard of Care
At the trial of a medical malpractice action, the plaintiff must prove the applicable standard of care through expert medical testimony unless "the physician does an obviously careless act ... from which a lay person can infer negligence." Pfiffner, supra at 1233. Opinions from medical professionals are necessary for the determination of the applicable standard of care and whether or not that standard was breached. Warren v. Everist, 30,187 (La. App.2d Cir.1/21/98), 706 So.2d 593, writ denied, 98-0477 (La.4/3/98), 717 So.2d 1132. It is for the trier of fact to evaluate conflicting expert opinion in relation to all of the circumstances of the case. Id. This expert testimony must be tempered by the knowledge that Louisiana law does not hold the physician to a standard of perfection. Garrett v. United States, 667 F.Supp. 1147 (W.D.La.1987). A treating physicianwhether a general practitioner or specialistis only liable if his actions fall below that standard of care ordinarily exercised under similar circumstances by members of his profession. Id.
Plaintiffs insist that the applicable standard of care requires the admitting physician and the consulting physician to consult or communicate directly with each other to reach a decision to discharge a patient from the hospital. From our review, this issue was disputed regarding the extent of communications necessary to be exchanged between the two doctors and further involved consideration of the appropriateness of both doctors' diagnosis of Mrs. Strange's condition prior to her discharge.
Plaintiffs' position regarding the breach of the standard of care rests upon Dr. Cummings' testimony that he did not discharge Mrs. Strange following his 8:30 a.m. visit on May 23 and that he did not talk with Dr. Shroff thereafter and agree to her discharge that afternoon. A thorough review of Dr. Cummings' testimony, nevertheless, reveals that it was equally supportive of the defensive view of the standard of care. The reason Dr. Cummings was "adamant" that Mrs. Strange should not have been discharged in the morning of May 23 was because she had recently taken pain medication that could have masked symptoms of abdominal pain. He was just as adamant, however, that she had shown improvement since her last vomiting episode, and he defended his decision not to order a further x-ray.
Concerning the communication issue, Dr. Cummings was clear that he and Dr. Shroff had been in direct communication regarding their patient's condition continuously prior to the morning of May 23. He also stated that because of their working relationship, he felt that he could have discharged Mrs. Strange unilaterally without obtaining Dr. Shroff's agreement. Dr. Cummings was never directly asked his view of whether Dr. Shroff's decision at 1:00 p.m. was improper. Instead, he gave the following testimony on direct examination by the plaintiffs' attorney:
Q. And, Doctor, you know, I don't want to beat a dead horse, but, you know, you certainly testified that Dr. Shroff had the right to discharge her in the afternoon.
A. It's his patient.
*1087 Q. Right. I think you've made it pretty clear that you disagreed with it, you refused to discharge her?
A. When I saw her that morning, she was not ready for discharge.
Q. Well, you know, we keep going in circles here, but you also testified that you didn't think she was ready in the afternoon?
A. I said if he would have called me and we would have discussed, I probably would have argued against it; however, it's his prerogative, especially if he has a relationship with the patient, and I've done the same thing, to send a patient home. And if the patient becomes ill, to return immediately for care. I mean, that's ...
The defense expert, Dr. Charles Morgan, was among the three internists who served on the Medical Review Panel convened to investigate the Stranges' malpractice allegations. The panel opinion unanimously concluded that Dr. Shroff did not violate the standard of care in his treatment of Mrs. Strange. Dr. Morgan testified that nothing in the medical records suggested that Mrs. Strange was not ready for discharge, nor did anything suggest evidence of the complications that subsequently developed. He thought that Mrs. Strange's earlier vomiting episode was a one-time event, and that any possible post-operative ileus she might have had resolved itself by the time she was discharged.
From this evidence, the issue of the standard of care is not as narrow as the plaintiffs' argue. First, aside from the lack of direct communication between the two doctors, the jury could conclude that neither doctor breached the standard of care in their diagnosis of their patient's condition on May 23. They both viewed that she had progressed so that the symptoms of ileus and blockage appeared to be ending. While the diagnosis was incorrect, it did not represent a breach of the standard of care. Therefore, as opined by Dr. Morgan, her discharge at 2:00 p.m. on May 23 might be allowed by doctors acting within the standard of care and the same unfortunate results would have followed. Second, although the medical testimony did indicate that the better practice would have been for the doctors to directly consult with each other before the discharge, there was additional expert testimony that Dr. Schroff's review of the medical chart regarding Dr. Cummings' morning examination was sufficient communication. Dr. Cummings, himself, confirmed that Dr. Shroff was completely informed of the patient's condition and in the position to make the discharge decision without further communication.
The standard of care in this case was not so obvious that the jury could infer negligence merely because the two doctors did not directly discuss the patient's discharge. The standard of care was therefore dependent on the facts as determined from the evidence and explained by the medical experts. The jury's prerogative to review those facts and consider those opinions requires us to give manifest error deference to their decision that the standard of care was not breached. We cannot say that a ruling that the standard of care was not breached in this case was clearly wrong.

Conclusion
For the foregoing reasons, we affirm the judgment of the trial court dismissing appellants' suit. Costs of the appeal are assessed to appellants.
AFFIRMED.
BROWN, C.J., concurs with written reasons.
*1088 BROWN, C.J., Concurring,
Cause-In-Fact
I respectfully disagree with the cause-in-fact conclusion in the majority opinion. I note that Nurse Allen was unsure of when Mr. Strange called concerning his wife's deteriorating condition. She testified, "It was probably between four and five, five or five-thirty." What is obvious is that the complications were occurring at the time of the call. I do not believe that the jury found or could have reasonably found that Mrs. Strange's complications were due to an unreasonable delay in returning to the hospital.
Standard of Care
Although it is reasonable to conclude that x-rays should have been taken before Mrs. Strange was released, I have to defer to the jury's discretion to accept some of the medical testimony that the standard of care was not breached in this regard. I also note that it was Dr. Cummings' place to call for the x-rays and plaintiffs' agreement that Dr. Cummings was not at fault.