940 So.2d 724 (2006)
Betty SHARP and Sherry Wyatt Brady, Plaintiff-Appellant,
v.
PARKVIEW CARE CENTER, INC., Defendant-Appellee.
Betty Sharp and Sherry Wyatt Brady, Plaintiff-Appellant,
v.
Parkview Care and Rehabilitation Center, Inc. and Mark Vance Shelton, M.D., Defendant-Appellee.
Nos. 41,341-CA, 41,342-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 2006.
*725 David A. Thomas, Baton Rouge, for Appellant.
Gregory Engelsman, Alexandria, for Appellee, Parkview Care Center, Inc.
Madeline J. Lee, Alexandria, for Appellee, Mark Vance Shelton, M.D.
Before WILLIAMS, STEWART and LOLLEY, JJ.
WILLIAMS, Judge.
The plaintiffs, Betty Sharp and Sherry Brady, appeal judgments in favor of the defendants, Parkview Care Center, Inc. ("Parkview") and Dr. Mark Shelton. The district court granted the defendants' motions for summary judgment. For the following reasons, we affirm in part, reverse in part and remand for further proceedings.

FACTS
On August 23, 1998, Joel Brady was admitted to Parkview Care Center following a stroke. The right side of Brady's *726 body was paralyzed, including his mouth and throat, and this condition interfered with chewing and swallowing. At the time of admission, the dietician noted Brady's diet as "soft, N.C.S. [no concentrated sweets] chop meat." At Parkview, Dr. Mark Shelton was the physician in charge of Brady's care until August 2001, when Dr. Julio Iglesias assumed care of Brady.
Following prostate surgery in October 1998, Brady's diet was changed to a 1,800 calorie diabetic diet. A nutritional care plan in effect from December 1998 through November 1999 noted that Brady had a "chewing problem" and the suggested approach was to "modify texture: chopped soft" diet. In February 1999, a barium swallow test given to Brady did not show any difficulties in swallowing.
On April 16, 2002, Brady was alone in his room eating a ham sandwich when he began to choke. Brady, who was in a wheelchair, wheeled himself into the hallway and gestured for help. A laundry room attendant saw Brady and called for assistance. Two nurses responded and tried to remove the obstruction from his airway. They performed the Heimlich maneuver and CPR until emergency medical personnel arrived. A quarter-size piece of meat was removed from Brady's throat and he was transported to the Winn Parish Medical Center, where he was pronounced dead. The death certificate of Joel Brady, the decedent, listed the causes of death as cardiorespiratory arrest, previous cerebrovascular accident, aspiration of a piece of meat and cardiac arrhythmia.
Subsequently, the plaintiffs, Betty Sharp and Sherry Brady, the adult children of decedent, filed a complaint with the Patient's Compensation Fund against the defendants, Parkview Care Center, Inc. and Dr. Mark Shelton, alleging that the medical treatment provided deviated from the standard of care of a nursing home. The plaintiffs also filed a petition for damages in district court against Dr. Iglesias, who was not a qualified health care provider under the medical malpractice statute. The plaintiffs' claims against Dr. Iglesias were later settled and dismissed. In January 2005, the Medical Review Panel ("MRP") opined that the evidence did not show that either Parkview or Dr. Shelton had breached the applicable standard of care.
Thereafter, the plaintiffs filed a petition for damages against the defendants. After discovery, Parkview and Dr. Shelton filed motions for summary judgment on the grounds that plaintiffs had not presented expert opinion showing that defendants had deviated from the applicable standard of care. Defendants attached the MRP opinion and affidavits of the MRP members in support of their motions. In opposing summary judgment, plaintiffs submitted the affidavits of Dr. Robert Rush and Susan Lofton, Ph.D., a registered nurse, who opined that Parkview and Dr. Shelton had breached the standard of care.
After a hearing, the district court granted the defendants' motions for summary judgment, without issuing reasons for the decision. The court rendered judgments in favor of defendants, dismissing plaintiffs' claims. Plaintiffs appeal the judgments.

DISCUSSION
In several assignments of error, the plaintiffs contend the district court erred in granting summary judgments in favor of the defendants. The plaintiffs argue that the expert affidavits which they submitted were sufficient to create a genuine issue of material fact as to whether defendants breached the applicable standard of care.
*727 Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). Summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of every action. LSA-C.C.P. art. 966(A)(2); Hawes v. Kilpatrick Funeral Homes, Inc., 39,089 (La.App.2d Cir.11/17/04), 887 So.2d 711. Summary judgment may be rendered to dispose of a particular issue, theory of recovery, cause of action or defense, even though the granting of same does not dispose of the entire case. LSA-C.C.P. art. 966(E).
On a motion for summary judgment, the burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter before the court, the mover's burden on the motion does not require that all essential elements of the adverse party's claim, action or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense. Thereafter, the adverse party must produce evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. LSA-C.C.P. art. 966(C)(2); Hawes, supra. In determining whether summary judgment is appropriate, appellate courts conduct a de novo review of the evidence, employing the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Ocean Energy, Inc. v. Plaquemines Parish Gov't, 04-0066 (La.7/6/04), 880 So.2d 1.
In a medical malpractice action, the plaintiff must prove the applicable standard of care, the breach of this standard of care, and the causal connection between the breach and the resulting injury. LSA-R.S. 9:2794(A); Britt v. Taylor, 37,378 (La.App.2d Cir.8/20/03), 852 So.2d 1128; Orea v. Brannan, 30,628 (La.App.2d Cir.6/24/98), 715 So.2d 108. Generally at trial, a plaintiff must prove the applicable standard of care through expert medical testimony unless, "the physician does an obviously careless act . . . from which a lay person can infer negligence." Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228 at 1233; Strange v. Shroff, 37,353 (La.App.2d Cir.7/16/03), 850 So.2d 1077. Expert opinion testimony in the form of an affidavit or a deposition may be considered in support of or opposition to a motion for summary judgment. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226.
In the present case, defendants submitted the MRP opinion finding that the record did not show any "pattern of swallowing disturbance" to indicate that decedent should have been on a different diet, and concluding that defendants had not breached the standard of care. Defendants also submitted the affidavits of Drs. Eric Dupree, Robert Morrison and Bruce Barton, the MRP members. Dr. Dupree stated that although the decedent initially had swallowing problems after his stroke in 1994, he was placed on a "regular 1800 calorie diabetic diet" after admission to Parkview and did not have a choking incident until his death in April 2002. Dr. Dupree found that decedent did not have any symptoms to warrant placing him on a restricted diet during the time Dr. Shelton was the treating physician.
Dr. Morrison stated that the medical evidence did not show that decedent had *728 any swallowing difficulty on the day of his death or during the weeks leading up to the incident. Dr. Morrison opined that the choking incident occurred due to decedent's "lack of attention" and had nothing to do with his diet.
Dr. Barton stated that the MRP opinion was based on the decedent's previous barium swallow tests, which did not show a swallowing problem or any abnormality of the esophagus. Dr. Barton opined that the evidence did not support the assertion that Parkview failed to meet the applicable standard of care.
In opposition to summary judgment, the plaintiffs submitted the affidavits and expert reports of Susan Lofton, R.N., Ph.D., and Dr. Robert Rush. In her affidavit, Dr. Lofton referenced her report, which opined that the Parkview nursing staff did not meet the applicable standard of care and that this breach caused the decedent's death. Dr. Lofton's report noted that she had earned a doctorate degree with a specialization in gerontological nursing. Dr. Lofton stated that in preparing the report, she had reviewed the medical records of Parkview, Dr. Shelton and Dr. Iglesias.
Dr. Robert Rush opined in his affidavit that Dr. Shelton breached the standard of care for physicians who treat nursing home patients. In his report, Dr. Rush noted his experience as operator of an acute care hospital with nursing home patients and stated that he had reviewed the medical records of decedent, the deposition of Dr. Iglesias and the MRP opinion. Dr. Rush stated that when decedent was admitted to Parkview he was placed on a chopped, soft diet with supervised dining because of his lack of control over the eating process, but this dietary restriction was omitted when decedent was placed on a diabetic diet. Dr. Rush opined that decedent should have been continued on a mechanical chopped, soft diet and that Dr. Shelton's failure to maintain such a diet was a breach of the standard of care contributing to decedent's death.
The exhibits submitted by the parties contain various medical records relating to the decedent's stay at Parkview, including Dr. Shelton's progress notes, periodic care plans and summaries, nurses' notes and dietary progress notes. Parkview admission forms prepared in August 1998 show that decedent was initially placed on a "chopped, soft diet." However, Dr. Shelton's "standing orders," dated January 1999 and January 2000, provide: "May alter texture of diet as tolerated. . . . May deviate from prescribed diet on special occasions." Dr. Shelton's records include a report of the February 1999 esophagus x-ray results showing that decedent "swallowed barium without difficulty." In April 2000, Dr. Shelton noted that decedent was swallowing well and in January 2001, that decedent was "eating and drinking well."
In the March 1999 care plan, decedent's diet was listed as "NCS chopped soft," and this diet continued through November 2000. However, the February 2001 care plan listed decedent's diet as "1500 cal ADA," and no longer referred to the restriction of chopped, soft. In the Parkview resident assessment form, dated September 4, 1998, among a list of problems in section K, the box labeled "chewing problem" is marked, but the boxes labeled "swallowing problem" and "mechanically altered" diet are not marked.
However, in the November 2000 resident assessment, the chewing problem is no longer indicated and the box labeled "none of above" is marked. Additionally, in a November 2000 dietary supplement assessment form, the decedent's food consistency is indicated as "regular," not mechanically altered or chopped, soft. A "Nutritional Assessment" form covering the periods of March 2001, June 2001, *729 September 2001 and February 2002, listed decedent's diet each time as "1500 cal ADA," without any limitations as to texture, and indicated "yes" for the ability to chew and swallow in each period.
Although a nurses' note of March 10, 2001, stated that decedent tolerated oral medications well, but with "difficulty swallowing due to CVA," another note two days later stated that decedent took his medication without difficulty. The nurses' notes do not contain any further references to a swallowing difficulty. Instead, the notes indicate that decedent was regularly eating breakfast, which included bacon and eggs with biscuits. As early as March 1999, the quarterly nursing assessments noted that decedent was eating his meals in his room by himself at his request. The May 2000 assessment stated that decedent "feeds self in room, appetite good, snacks frequently." The medical records show that decedent continued to eat meals and snacks in his room through February 2002 without any reported swallowing difficulties or choking incidents.
At the time of decedent's admission in August 1998, the dietician noted that his "diet is soft N.C.S. chop meat." However, the October 5, 1998 entry states that his diet is "Regular NCS, chopped meats." As of October 28, 1998, when decedent's diet was changed to "1800 cal ADA," no further restrictions as to food texture appear in the dietary progress notes. To the contrary, the November 17, 1999 entry stated that decedent was able to "eat all food."
The plaintiffs contend there is a genuine issue of material fact as to whether decedent had been restricted to a chopped, soft diet at the time of his death and in July 2001, when Dr. Shelton was his treating physician. However, the medical records demonstrate that by July 2001, the decedent was no longer restricted to a chopped, soft diet as shown by the November 2000 resident assessment, which no longer indicated a chewing problem, and the February 2001 care plan, which did not restrict the texture of food in decedent's diet.
Plaintiffs presented the opinion of Dr. Rush that Dr. Shelton breached the standard of care by relying on the results of the barium swallow and esophagus x-ray tests as reasons for not taking greater dietary precautions and by failing to maintain decedent on a "mechanical" chopped and soft diet as required because of his lack of control over the eating process. However, the evidence does not support Dr. Rush's assertion that decedent lacked control over his eating function. The medical records show that over time decedent demonstrated an ability to eat non-soft foods, such as biscuits, bacon and various snacks, without any apparent difficulty in swallowing and without choking. While decedent was a resident at Parkview, the only reference to swallowing difficulty is the nurse's note of March 10, 2001, and there is no indication of this problem two days later when the nurse noted that decedent took his medication without difficulty.
Dr. Rush opined that Dr. Shelton's failure to maintain the decedent on a mechanical chopped soft diet caused his death. However, the record shows that Dr. Shelton was no longer involved in the decedent's care after Dr. Iglesias became decedent's attending physician in August 2001. Dr. Iglesias stated in his deposition that from that time forward he made the decisions regarding the treatment of decedent. Dr. Iglesias testified that when he became attending physician, the decedent was not exhibiting any eating or swallowing difficulties and his only dietary limitation was a diabetic diet. Dr. Iglesias stated that there were no reports that decedent had previously choked on food.
*730 In a medical malpractice action, the plaintiff has the burden of proving by a preponderance of evidence the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Lewis v. Tulane University Hospital and Clinic, 03-0184 (La.App. 4th Cir.8/27/03), 855 So.2d 383.
The medical records show that during the time of Dr. Shelton's treatment, the decedent did not have any choking incidents and that after August 2001, Dr. Shelton was no longer participating in decedent's care. Dr. Rush's report does not specify the manner in which the conduct of Dr. Shelton could have caused decedent's subsequent choking on a piece of sandwich. Based upon the evidence presented, we must conclude that the plaintiffs have not presented factual support to carry their burden of proving that the treatment delivered by Dr. Shelton was a cause of decedent's death. Thus, the district court did not err in granting Dr. Shelton's motion for summary judgment.

Parkview Motion for Summary Judgment
As previously noted, the plaintiffs submitted the affidavit and report of Dr. Lofton in opposition to Parkview's motion for summary judgment. In her report, Dr. Lofton explained that she evaluated the nutritional needs of decedent by applying the "nursing process methodology," which involves the assessment, planning and implementation of patient care and is recognized by the American Nursing Association.
Dr. Lofton stated that there were "numerous points of documentation" in the medical records indicating the decedent's difficulty in chewing and swallowing after his stroke. Dr. Lofton opined that the gerontological nursing care standard was not met in this case because the Parkview nursing staff failed to consistently update decedent's care plan to reflect his repeated problems with chewing and swallowing. Dr. Lofton stated that the nursing standard of care also required the Parkview staff to provide the decedent with a diet meeting his special dietary needs. Dr. Lofton opined that Parkview breached this standard by allowing decedent to eat meals without supervision and to take items from a food cart that was left unattended. Dr. Lofton concluded that this breach of care was a cause of decedent's death.
The medical records show that decedent was admitted to Parkview because he needed assistance in performing daily activities following his stroke. The Parkview records include a medical report advising that decedent "will eat fast if not observed and instructed to eat slowly." Despite this report, the nurses' notes indicate that within one year of his admission, Parkview staff members allowed decedent to eat meals in his room without supervision. The records show that there was a dining hall available where Parkview residents could eat while supervised by staff.
In her report, Dr. Lofton noted that decedent was a patient with many health problems who needed close monitoring and supervision at all meal times given his partial paralysis after the stroke. Dr. Lofton opined that because of his physical impairment, the decedent was at a "high risk" for choking and he should not have been allowed to eat meals without supervision.
In addition, the nurses' notes indicate that decedent was previously observed waiting for the snack cart and that he frequently ate snacks when unsupervised by the nursing staff. Dr. Lofton opined that Parkview staff breached the standard of care on the date of decedent's death by allowing him to have free access to an unattended food cart, to remove a sandwich *731 and to eat the food in his room without supervision. Dr. Lofton concluded that this breach of the standard of care by Parkview personnel was a cause of decedent's choking death.
Although summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor. Knowles v. McCright's Pharmacy, Inc., 34,559 (La. App.2d Cir.4/4/01), 785 So.2d 101. Furthermore, on a motion for summary judgment, the district court cannot make credibility determinations or weigh conflicting evidence. Independent Fire Insurance Co., supra; Knowles, supra. In light of the factual circumstances described above, one could draw an inference that more adequate supervision by the Parkview nursing staff could have prevented decedent from eating too quickly and choking, or at least provided an opportunity for timely intervention to prevent his death.
After reviewing the record, we conclude that the expert testimony submitted by plaintiffs raised a genuine issue of material fact as to whether the Parkview nursing staff should have supervised decedent more closely at meal times as part of a comprehensive care plan, given his propensity to eat quickly and his continuing physical limitations. Consequently, the district court erred in granting Parkview's motion for summary judgment.

CONCLUSION
For the foregoing reasons, the district court's judgment granting Dr. Mark Shelton's motion for summary judgment is affirmed; the summary judgment rendered in favor of Parkview Care Center is hereby reversed and the matter is remanded for further proceedings. Costs of this appeal are assessed to the appellee, Parkview Care Center.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.